05-2516-cr(L), 05-3303*-cr(L), 05-6178*-cr(XAP)
USA v. Cutler

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: April 24, 2007          Decided: March 17, 2008)


Docket Nos. 05-2516(L), 05-3303*-cr(L), 05-6178-cr*(XAP)

_____

UNITED STATES OF AMERICA,

                              Appellant,

                              - v. -

JAMES CUTLER,
                              Defendant-Appellee.


UNITED STATES OF AMERICA,

                              Appellee-Cross-Appellant,

                              - v. -

SANFORD FREEDMAN,
                              Defendant-Appellant-Cross-
                              Appellee.
_____

Before:   JACOBS, Chief Judge, KEARSE and POOLER, Circuit Judges.

          Appeals by the United States challenging the sentences imposed on the above defendants in the United States District Court for the Southern District of New York, Loretta A. Preska, Judge, following their convictions of, inter alia, bank fraud, tax

---

\*    Appeals by the government consolidated for purposes of this opinion.

evasion, and false statements, and conspiracy to commit those offenses and mail fraud, 18 U.S.C. §§ 371, 1014, 1341, 1344, and 1623, and 26 U.S.C. § 7201.

Vacated and remanded for resentencing.

Judge Pooler concurs in a separate opinion.

JUSTIN S. WEDDLE, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Stanley J. Okula, Jr., Peter G. Neiman, Assistant United States Attorneys, New York, New York, on the brief), for Appellant in No. 05-3303.

STANLEY J. OKULA, Jr., Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Justin S. Weddle, Barbara A. Ward, Celeste L. Koeleveld, Assistant United States Attorneys, New York, New York, on the brief), for Appellee-Cross-Appellant in No. 05-6178.

WILLIAM J. SCHWARTZ, New York, New York (Jason M. Koral, Kronish Lieb Weiner & Hellman, New York, New York, on the brief), for Defendant-Appellee James Cutler in No. 05-3303.

AUDREY STRAUSS, New York, New York (Andrew T. Gardner, Lisa H. Bebchick, Sloan S. Johnston, Fried, Frank, Harris, Shriver & Jacobson, New York, New York, on the brief), for Defendant-Appellant-Cross-Appellee Sanford Freedman in No. 05-6178.

KEARSE, Circuit Judge:

Defendants James Cutler and Sanford Freedman, following a jury trial in the United States District Court for the Southern District of New York, Loretta A. Preska, Judge, were convicted, along with others, on various charges relating to extensive bank frauds and tax frauds. Issues raised in an appeal by Freedman have been dealt with in a summary order filed today, see United States v.

-2-

Freedman, Nos. 05-2516, -6068. This opinion deals with an appeal by the government, No. 05-3303, challenging the sentence imposed on Cutler, and a cross-appeal by the government, No. 05-6178, challenging the sentence imposed on Freedman.

Cutler was convicted on one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371; two counts of bank fraud, in violation of 18 U.S.C. § 1344; one count of making false statements, in violation of 18 U.S.C. § 1014; one count of tax fraud conspiracy, in violation of 18 U.S.C. § 371; and two counts of tax evasion, in violation of 26 U.S.C. § 7201. He was sentenced principally to a prison term of one year and one day, to be followed by five years' supervised release, and was ordered to pay restitution in the amount of $29,775,000 and to forfeit $1,381,974. Freedman was convicted on one count of conspiring, in violation of 18 U.S.C. § 371, to defraud financial institutions and the Internal Revenue Service ("IRS") through false statements in violation of 18 U.S.C. § 1014, bank fraud in violation of 18 U.S.C. § 1344, and mail fraud in violation of 18 U.S.C. § 1341; four counts of bank fraud, in violation of 18 U.S.C. § 1344; six counts of making false statements, in violation of 18 U.S.C. § 1014; and one count of perjury, in violation of 18 U.S.C. § 1623. Freedman was sentenced principally to a three-year term of probation and was ordered to perform 700 hours of community service per year during the probationary period, to pay restitution in the amount of $14,600,000, and to forfeit $3,013,739.48.

The government contends that under the 1997 version of the Sentencing Guidelines ("Guidelines"), which was applied to both defendants, and to which reference is made throughout this opinion,

a proper sentencing calculation for Cutler would have resulted in a recommended prison term in the range of 78-97 months. It contends that the district court abused its discretion in granting downward departures to reach a range of 12-18 months and that the prison term imposed, one year and one day, was substantively unreasonable. As to Freedman, the government contends that proper sentencing calculations would have resulted in a Guidelines-recommended prison term in the range of 108-135 months. The government contends that the district court erred in certain Guidelines-application rulings and abused its discretion in granting downward departures, and that the sentence imposed--in failing to order a substantial term of imprisonment--was substantively unreasonable. For the reasons that follow, we vacate both sentences and remand for resentencing.

## I. BACKGROUND

The prosecutions that are the focus of these appeals arose out of the business and financial dealings in the early 1990s of codefendants Stanley S. Tollman and Monty D. Hundley, hotel magnates whose principal business organization in the 1980s, Tollman-Hundley Hotels ("Tollman-Hundley"), owned a network of hotels, including the Days Inn of America ("Days Inn") chain and more than 100 individual hotels. Hundley was tried with Cutler, codefendant Howard Zukerman, and Freedman and convicted on 28 counts relating to these matters. Tollman left the United States just prior to his scheduled arraignment in this case and remains a fugitive.

Cutler was Tollman-Hundley's chief financial officer.

-4-

Zukerman was vice president for finance. Freedman was Tollman-Hundley's executive vice president for development and its general counsel. Government exhibits ("GX") showed that Freedman also owned various percentages (generally between 2.5 and 4.75 percent) of most of the business entities owned by Tollman and Hundley. (See, e.g., GX 601 (Freedman's 1993 application for a Mississippi gaming license); GX 601-B (Tollman's 1995 application for a Mississippi gaming license).)

The evidence as to the principal events, taken in the light most favorable to the government, is described below.

A. The $100 Million Bank Fraud Scheme

By the late 1980s, Tollman and Hundley each had an estimated net worth of over $100 million, gained largely from the Tollman-Hundley venture. Tollman and Hundley had financed the growth of their hotel network by borrowing hundreds of millions of dollars from banks and others. Although they usually borrowed the money through limited liability entities, they also gave their creditors personal guarantees.

In the early 1990s, many of the Tollman-Hundley properties were unable to meet their debt service obligations, and a voluntary restructuring of the debt ensued. Part of the restructuring required Tollman and Hundley to sign deficiency notes instead of guarantees. These notes made Tollman and Hundley personally obligated to Tollman-Hundley creditors for much of its debt. (See Trial Transcript ("Trial Tr.") at 4256 (contrasting guarantees, which are obligations to pay "in case someone else doesn't," with

deficiency notes, which "[a]re direct obligations to pay").) Ultimately, Tollman and Hundley emerged from the restructuring of the Tollman-Hundley debt personally responsible for approximately $100 million of the debt. Freedman participated in the negotiations that led to this restructuring.

1. Coordination and Misrepresentations by Freedman

Also in the early 1990s, Tollman and Hundley negotiated an agreement to sell key assets of Days Inn to Hospitality Franchise Systems ("HFS" (now known as Cendant Corporation)), in exchange for the right to receive a specified amount of HFS stock over a several-year period if Days Inn franchises met certain financial targets (the "earn-out agreement"). The performances of those franchises ultimately resulted in Tollman and Hundley receiving HFS shares worth "somewhat in excess of 100 million dollars." (Trial Tr. 3155; see also GX 1504 (citing 16 other exhibits) showing net proceeds totaling more than $107 million from the sales of the HFS stock accruing to Tollman and Hundley.)

Due in large part to the more than $100 million in HFS stock earn-out rights accruing to Tollman and Hundley during the course of the earn-out agreement, Tollman and Hundley appeared to have the capacity to pay off their approximately $100 million in deficiency-note debts to the Tollman-Hundley creditors in full. Instead, Tollman and Hundley planned to use the proceeds from their HFS stock to fund a riverboat casino venture in Mississippi. However, the large outstanding Tollman-Hundley debt, along with the obligations of Tollman and Hundley on the deficiency notes (the first payments on which were due on June 1, 1993), had the potential

- 6 -

to lay claim to $100 million of the proceeds from the HFS stock and to cast a pall on their casino plans. Accordingly, Tollman and Hundley embarked on a plan in early 1993, assisted principally by Freedman, Zukerman, and Cutler, to induce the Tollman-Hundley creditors to settle for far less than the balances due on the loans.

In the spring of 1993, the coconspirators did the following. Tollman and Hundley assigned their rights under the HFS earn-out agreement to Bryanston Group, Inc. ("Bryanston" or "Bryanston Group"). Bryanston Group was owned principally by Tollman and Hundley; Freedman owned 4.75 percent and was its executive vice president. The assignment agreement was signed for Bryanston by Freedman.

In addition, Tollman, Hundley, Zukerman, and Freedman contacted Tollman-Hundley's creditors and represented that Tollman and Hundley were having "great financial problems" (Trial Tr. 2071) and would be unable to satisfy their deficiency-note obligations. Richard Werner, a manager at Marine Midland Bank (now HSBC), testified that beginning early in 1993, he had several discussions on that subject, meeting principally with Zukerman and Freedman. (See id. at 2068-69.) Zukerman told the bankers that the cash flow from the hotels owned by Tollman-Hundley was insufficient to satisfy all the debts and that Tollman-Hundley itself and Tollman and Hundley individually would consider filing for bankruptcy if they were not able to get all the creditor banks to enter into repayment agreements; Zukerman said they "were in deep financial trouble." (Id. at 2071.)

Freedman, "[i]n those conversations and throughout those conversation[s], . . . made other comments in support of those

- 7 -

claims about the[] financial distress [of Tollman and Hundley]." (Id. at 2072.) Werner testified that Freedman "made statements in support of they don't have the financial wherewithal to meet these obligations." (Id.)

Contemporaneously with these representations, in connection with their casino plans, Tollman, Hundley, and Freedman were submitting applications to the Mississippi Gaming Commission (or "Gaming Commission") for gaming licenses. Each application attached a schedule ("D Schedule") listing the applicant's business assets and showing, inter alia, the name of the asset, its market value, the names of the other investors in each asset, and the market value of each investor's interest in the asset. Freedman's D Schedule showed that the total market value of his own interests in these assets was $3,224,805; it also showed the total market values of Tollman's interests, $34,477,181, and Hundley's interests, $37,183,441. (See GX 601.) The D Schedules attached to the applications of Tollman and Hundley were identical to that of Freedman. (See GX 601-B, 601-E.)

In addition to contacting Tollman-Hundley creditors and telling them that Tollman and Hundley were in deep financial trouble, Tollman and Hundley enlisted the aid of unindicted coconspirator James Cohen, who was to be an investor in the riverboat casino venture, to approach some of the creditor banks and offer to buy their Tollman-Hundley loans at steeply discounted prices. Hundley and Freedman instructed Cohen to conceal his relationship with Tollman and Hundley and to tell the banks instead that he represented an off-shore investor that wanted to do business with Tollman-Hundley and wanted to own the Tollman-Hundley debts,

but that the interested investor would not be willing, in light of the (supposed) financial straits of Tollman and Hundley, to pay more than pennies on the dollar to purchase those debts. Freedman gave Cohen a list of banks to contact, showing the maximum amounts for which they hoped to persuade the banks to settle, to wit, 20 percent or less of the outstanding balances. Cohen was instructed on what to say, in the conversations with the banks, by Hundley and Freedman. (See Trial Tr. 3736-39.) During the period of his negotiations, Cohen made progress reports to Freedman and continued to receive general overall instructions from Tollman, Hundley, and Freedman. (See, e.g., id. at 3751.)

There was, however, no independent interested off-shore investor. In order to provide the purchaser supposedly represented by Cohen, Freedman had Tollman-Hundley's outside counsel incorporate two companies, Paternoster Second Holdings Inc. ("Paternoster") and Chelsea Acquisitions Inc. ("Chelsea"), that Cohen would say were controlled by the foreign investor. These companies were in fact controlled by Tollman and Hundley, their expenditures being funded by Bryanston (see GX 1506 ("Debt Purchases by Paternoster/Chelsea Funded by Bryanston")), which was owned by Tollman, Hundley, and Freedman. Nonetheless, when Chemical Bank made its willingness to sell certain of its Tollman-Hundley loans to Chelsea contingent on the receipt of assurances that Chelsea was not owned or controlled by Tollman or Hundley, Freedman sent the bank a letter stating that the assurances were enclosed; he enclosed a letter signed by Tollman and Hundley "certify[ing] to Chemical Bank that neither [Tollman nor Hundley] owns any legal or beneficial interest, directly or indirectly, in [Chelsea]." (GX CH-9 (Letter from Freedman to Thomas

-9-

H. Kozlark, Vice President, Chemical Bank, dated May 23, 1994, attaching May 12, 1994 letter signed by Tollman and Hundley).)

Tollman and Hundley recruited others, including relatives of Tollman who had surnames other than Tollman, to pose as officers of Paternoster and Chelsea and to sign documents for those companies. For example, Leon Smith, Tollman's nephew by marriage, testified that he signed Paternoster contracts at the request of Freedman and signed Paternoster tax returns at the request of Cutler. Smith had never invested in Paternoster and did not know the names of its investors; he had never received any money from Paternoster and did not know the name of anyone who had; he did not "know of any telephone number that anybody could dial in the 1990s where somebody would have answered 'Paternoster.'" (Trial Tr. 2613-14.)

When banks eventually agreed with Cohen to sell their Tollman-Hundley debts, some were paid from escrow accounts held by Tollman-Hundley's outside counsel that had ostensibly been funded by Paternoster or Chelsea. (See GX 1506-A to 1506-D (charts listing the various transactions).) The funds had in fact come largely from Bryanston Group, to which Tollman and Hundley had assigned the lucrative HFS stock rights. (See GX 1506 (chart showing amounts paid for Tollman-Hundley debt from Bryanston accounts).)

The banks contacted by Cohen were not immediately persuaded to sell their Tollman-Hundley loans cheaply. For example, a representative of First National Bank of Chicago ("First Chicago") with whom Cohen had negotiated (see Trial Tr. 3748) stopped by Cohen's office in New York to "make sure [Cohen] existed" (id. at 3749) and expressed concern that Cohen might be seeking to purchase

the loans for Tollman or Hundley (see id.). Cohen gave his assurance, as instructed by Hundley and Freedman, that this was not the case. First Chicago was eventually persuaded to sell its Tollman-Hundley loans, the balances on which totaled approximately $4.5 million, to Cohen for $1.25 million, selling them to a company that Cohen testified he had set up for "[f]raudulent transactions" (id. at 3752). Although the agreement with First Chicago recited that Cohen had no agreement to resell the Tollman-Hundley loans to any entity controlled by Tollman or Hundley, Cohen purchased the loans with the understanding that they would be repurchased by Tollman and Hundley, having received that understanding from Tollman, Hundley, and Freedman. (See, e.g., id. at 3752-54.) Paternoster later purchased those loans from Cohen's company, paying Cohen $1.25 million plus interest. (See id. at 3755-57.)

On another occasion, Cohen was able to reach a deal in which his sham foreign investor was to purchase certain of Chemical Bank's Tollman-Hundley loans, whose balances totaled $21.7 million, for 10 percent of that sum. Cohen called Freedman to find out whether Cohen would be expected to advance the $2.17 million. Freedman immediately responded that Cohen "didn't need to worry about it. It was taken care of." (Id. at 3762-63.)

The banks repeatedly sought personal financial information from Tollman and Hundley themselves as to their ability to pay the deficiency notes. Marine Midland, for example, owning Tollman-Hundley loans whose balances totaled some $12.5 million, asked Zukerman and Freedman to provide written financial statements for Tollman and Hundley individually, such as balance sheets, tax returns, and forecasts of future income and cash flow. At times,

- 11 -

Marine Midland was told that information was not available; at other times it received documents that were many inches thick but contained no meaningful information. (See, e.g., id. at 2073, 2102.) Marine Midland eventually sold its loans to Paternoster for $1.75 million.

2. Misrepresentations by Cutler

For creditors who remained unsatisfied by the documents provided by Tollman and Hundley through Zukerman and Freedman, misinformation was sent by Cutler, Tollman-Hundley's chief financial officer. For example, in January 1995, Cutler sent Wells Fargo Bank ("Wells Fargo") financial statements for Tollman and Hundley "dated as of December 31, 1992," which Cutler represented were "the most recently prepared" financial statements. (GX WF-6 (Letter from Cutler to Christine Rotter, Vice President/Manager, Wells Fargo Bank, and Michael Sherrow, Eastdil Realty, Inc., dated January 26, 1995, at 1).) These 1992 statements were not in fact Tollman's and Hundley's most recent financial statements; in 1993, Tollman and Hundley had submitted to the Mississippi Gaming Commission personal financial statements as of March 31, 1993, which also showed the anticipated value of Bryanston as of May 31, 1993. The statements that Cutler sent to Wells Fargo in January 1995 contained an entry for Bryanston--but only under its former name, "Buckhead"--and the Buckhead entry did not include the value of the HFS stock, nearly $45 million of which had been received by mid-February 1994.

In August and September 1995, Cutler provided disparate financial information to three banks and to the Mississippi Gaming Commission. During that period, he was meeting with and giving

financial information to the Financial Evaluator for the Mississippi Gaming Commission in support of Tollman's July 31, 1995 application for a Mississippi gaming license. On August 18, 1995, Cutler sent a letter to the Gaming Commission enclosing numerous schedules "[a]s a follow-up" to supplement and correct Tollman's application, including recent financial statements of Bryanston. (GX 1014-A (Letter from Cutler to James M. Prewitt, Financial Evaluator, Mississippi Gaming Commission, dated August 18, 1995).) Tollman's application stated that the value of his stock in Bryanston was $21,135,746 (see GX 601-B, Schedule C); his Summary Financial Questionnaire (see GX 601-B, at 2) stated that his net worth was $27,371,230.

Contemporaneously, Cutler sent letters to two of the creditor banks stating that he was "[e]nclos[ing] . . . the latest information on the financial condition of Stanley S. Tollman and Monty D. Hundley." (E.g., GX CH-14 (Letter from Cutler to Thomas Kozlark, Chemical Bank, dated August 18, 1995); GX WF-9 (Letter from Cutler to Dale Christiansen, Wells Fargo Bank, dated September 27, 1995).) A similar letter was sent to Bank of America. Attached to Cutler's letters to the banks were financial schedules that supposedly summarized the business interests, personal assets, and obligations of Tollman and Hundley. Those schedules represented that Tollman and Hundley, respectively, had personal assets, as of July 31, 1995, of little more than $125,000 and $80,000.

The schedules that Cutler sent to the banks did not mention the HFS stock or the ownership interests of Tollman and Hundley in Bryanston; nor did Cutler's letters mention the HFS stock or Bryanston. Further, in purporting to show other outstanding

- 13 -

debts of Tollman and Hundley, with which the debts of each creditor bank would ostensibly be competing for collection, the documents sent by Cutler to the banks identified most of the current note holders as Paternoster or Chelsea--which, of course, unbeknownst to the banks, Tollman and Hundley owned. (See, e.g., GX WF-9 (Letter from Cutler to Dale Christiansen, Wells Fargo Bank, dated September 27, 1995 (unpaginated attachments)).)

Government exhibits listing the assets that were held in the name of Tollman or Hundley as of July 31, 1995, but not included on the schedules that Cutler sent to the banks, showed that as to Tollman, the "total value of assets not listed" was $31,592,019 (GX 1501 (emphasis in original)), and that as to Hundley, the "total value of assets not listed" was $25,640,795 (GX 1500 (emphasis in original)). Tollman and Hundley each had an interest in Bryanston alone worth more than $21 million. (See GX 1500, 1501.)

During the course of his participation in the bank frauds, Cutler received more than $900,000 in salary (see GX JD-7), which the district court ultimately found was compensation for his participation in those frauds (see Cutler Sentencing Transcript ("Cutler S.Tr.") 106, 113). As additional compensation, Tollman and Hundley gave Cutler the right to purchase stock in the casino venture worth some $400,000. (See GX 54; Trial Tr. 6664-65.)

The trial with respect to the above conduct resulted in, inter alia, (1) the convictions of Cutler and Freedman (along with Hundley and Zukerman) for conspiracy to commit bank fraud; (2) the conviction of Freedman on four substantive counts of bank fraud and six counts of making false statements to federally insured banks for purposes of influencing their decisions with respect to selling the

- 14 -

Tollman-Hundley loans; and (3) the conviction of Cutler on two substantive counts of bank fraud and one count of making a false statement to a federally insured bank.

In addition, Freedman had given deposition testimony under oath in a bankruptcy proceeding in which Paternoster had filed a claim. When questioned with respect to Tollman-Hundley debt that Paternoster had purchased, Freedman testified, inter alia, that he had no idea whether Paternoster had ever collected anything on that debt and that Tollman and Hundley had expressed "concern . . . that that debt has to be paid." (GX EM-5X.) Having initiated the creation of Paternoster on behalf of Tollman and Hundley and overseen Paternoster's purchases of Tollman-Hundley notes precisely to avoid having Tollman and Hundley called on to pay their deficiency notes, Freedman was convicted of perjury.

B. The $29 Million Tax Frauds

In addition to the above bank frauds, there were tax frauds. Cutler, as Tollman-Hundley's chief financial officer, was responsible for the tax reporting of Tollman-Hundley and the entities it comprised. For nearly a decade, Cutler caused the salaries of the senior leaders of Tollman-Hundley and certain of their aides to be paid in ways that were designed to evade proper taxation. For example, instead of being generated by a payroll service, as was the case with respect to most Tollman-Hundley employees, salary checks to these top employees were handwritten by someone who reported directly to Cutler; they were drawn on accounts of entities whose records were not sent to the payroll service; and on orders from Cutler, those entities did not report those salary

- 15 -

payments to the IRS. Further, salaries were frequently paid in a form--such as car payments or insurance premiums--that disguised the fact that they were salary; these payments too went unreported to the IRS. In addition, some salary payments were simply misdescribed as nontaxable reimbursement for expenses. This system, overseen by Cutler with respect to more than a dozen employees, resulted in the Tollman-Hundley entities' failure to report more than $29 million of the employees' earned income.

Cutler himself took advantage of the system he oversaw by causing tens of thousands of dollars paid to him each year not to be reported to the IRS. For example, he had Tollman-Hundley pay a portion of his salary indirectly by making rent payments directly to his landlord. And on his own tax returns he underreported his income. During one seven-year stretch, Cutler understated his income by a total of more than $236,000.

In connection with these acts, Cutler was convicted on one count of conspiracy to commit tax fraud and two counts of tax evasion (collectively the "tax frauds").

C. The Sentences

The Probation Department prepared a presentence report ("PSR") on each defendant. The PSRs calculated the total losses from the bank fraud conspiracy by subtracting the amounts for which the banks sold the Tollman-Hundley loans from the balances on those loans. The losses totaled more than $106 million.

Accordingly, the PSRs for both Cutler and Freedman began with a base offense level of 6 pursuant to Guidelines § 2F1.1, applicable to offenses involving "[f]raud and [d]eceit," and

recommended that that level be increased by 18 steps because the loss exceeded $80,000,000, see Guidelines § 2F1.1(b)(1)(S). The PSRs also recommended an additional two-step increase in offense level because "the offense involved . . . more than minimal planning," Guidelines § 2F1.1(b)(2)(A). Thus, the initial enhancements for Cutler and Freedman resulted in an offense level of 26.

Additional distinct adjustments were recommended for each defendant.

### 1. Cutler

With respect to Cutler's conviction on one count of conspiracy to commit tax fraud and two substantive counts of tax evasion, the PSR calculated an offense level of 22 pursuant to Guidelines §§ 2T1.1 and 2T4.1, based on a federal tax loss of more than $5 million. Combining, pursuant to Guidelines § 3D1.4, the offense levels for Cutler's bank frauds (26) and his tax frauds (22), the PSR recommended a combined total offense level of 28. As Cutler had no known criminal convictions, his criminal history category was I. Thus, with an offense level of 28, his Guidelines-recommended range of imprisonment was 78-97 months.

Although noting that Cutler apparently had been motivated by monetary gain and that his participation was critical to the success of the frauds, the PSR recommended that the court impose a prison term of only 60 months. It stated the probation officer's belief that 78 months of imprisonment would cause undue hardship to Cutler's three children (who lived with his ex-wife), to whose support he contributed a total of $1,900 per month, and would

slightly overstate the level of his culpability in the offense.

Cutler challenged the PSR's offense-level calculation on the ground that it overstated the bank fraud losses and that the PSR failed to find that he had played a minor role in the bank frauds; and he moved for downward departures on grounds relating to the nature of his participation in the frauds and his family circumstances. As to the amount of loss, Cutler argued that the PSR's calculation was erroneous because parts of the bank debts were nonrecourse, and hence uncollectible against Tollman and Hundley individually; thus, Tollman and Hundley could have repaid the recourse portions of the debts and the banks would have lost the remainder even in the absence of the frauds. Cutler argued that the losses caused by the frauds thus totaled only between $40 million and $80 million, rather than in excess of $80 million, and therefore that the offense-level enhancement for amount of loss should have been 17 steps rather than 18 steps. The court quickly rejected that contention, finding that the amounts of loss caused by the frauds were the differences between the loan balances and the amounts the banks received.

As to his participation in the bank frauds, Cutler contended that the PSR should have recommended a downward adjustment in offense level pursuant to Guidelines § 3B1.2(b), on the basis that he played only a minor role. The court also rejected this contention, finding "a downward adjustment for role in the offense" inappropriate "because of the criticality of Mr. Cutler's role in the success of what we have been calling the money lie." (Cutler S.Tr. 29.) The court thus "conclude[d] that a total offense level of 28 is appropriate." (Id. at 30.)

Cutler moved for a downward departure pursuant to Guidelines § 2F1.1, arguing that he performed only a few fraudulent acts and that his personal gain was minimal, and hence that the magnitude of the loss overstated his role and culpability in, and his gain from, the offense. See generally id. Application Note 10 ("In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted."). Cutler also moved for a departure pursuant to Guidelines § 5H1.6 (Policy Statement), arguing that he had "extraordinary family circumstances" (Cutler S.Tr. 30), to wit, three children to whose support he would not be able to contribute if he were in prison.

In opposition to these requests, the government pointed out, inter alia, that Cutler had derived substantial benefits from the offense in the form of stock and inflated salary; that, even if he had not, a lack of personal profit is not ordinarily a ground for departure; and that Cutler's lesser interest in the bank fraud offenses, in comparison to that of Hundley, was reflected in the fact that the Guidelines-recommended range of imprisonment for Hundley was twice that recommended for Cutler. The government also argued that a defendant's inability, while incarcerated, to support his dependents did not ordinarily provide a ground for departure and that, in addition, Cutler had artificially created his inability to support his children. It stated that Cutler had sold some of the proceeds of the bank fraud, to wit, his shares in the casino

venture, and used those proceeds to buy property in Nevada; however, he did not keep that property in his own name but rather put it in his current wife's name, out of the reach of his creditors, his ex-wife, and his children.

The district court granted Cutler's departure motion on both grounds, reducing his offense level by a total of 15 steps. First, the court departed downward by six levels, from 28 to 22, on the ground that the offense level calculated on the basis of the loss to the banks overstated the seriousness of Cutler's role, conduct, and offense:

> With respect to the application for departure on the ground that level 28 overstates the seriousness of Mr. Cutler's role in the bank fraud conspiracy, that application is granted.

> This is, in my view, analogous to the Court of Appeals decision in United States v. Restrepo in which the court noted that "the [sentencing] commission apparently contemplated some connection between the quantity of money implicated and the extent of a defendant's participation in the offense." 936 F.2d 661, [667] (2d Cir. 1991)[,] and, indeed, it appears that the commission so contemplated that relationship.

> Here, however that relationship does not exist, in my view, to an extent not contemplated by the commission.

> Here, Mr. Cutler's communications, including those set out by the government today during sentencing, although they were necessary to the scheme, were a small part of the scheme and he received little, if any, personal gain from the bank fraud scheme.

> Without reviewing it in detail, if the huge amount of money involved in the bank fraud scheme were reduced to a level more consistent with the seriousness of Mr. Cutler's offense, the offense level would likely be at or about 22. So the request for a downward departure on the ground that the seriousness of Mr. Cutler's conduct is overstated by the offense level is granted.

(Cutler S.Tr. 97-98 (emphases added).)

From level 22, with respect to both the bank fraud counts and the tax counts, the court departed downward nine levels for family circumstances that the court found to be extraordinary. (See id. at 98-100, 122.) The district court "acknowledge[d] that that is a disfavored basis for a departure" (id. at 98), but it concluded

nevertheless I believe in this case it has been demonstrated that the extraordinary circumstances present are of a kind and to a degree not taken into account by the guidelines.

Here, as we have discussed, Mr. Cutler has three children, one of whom has finished, apparently, two years in college. The children's ages are 20, 14 and 11.

Mr. Cutler has been ordered to pay child support and has in fact paid that support over time. As I understand it from the presentence report, other costs of those children have been paid by Mr. Cutler or he has caused them to be paid, including costs of visits with him.

As we also know from the presentence report and from counsel's submissions, the children's mother makes approximately $25,000 a year as a school bus driver. And in her letter [she] pointed out that the child support payments pay the rent and otherwise allow the children who remain in lower and secondary school to remain in the public school system in which they have been brought up in.

The former Mrs. Cutler also writes that, without the support that Mr. Cutler provides, the children would have to be taken out of the Somers School System and the college student would be prevented from returning to college and, in all likelihood, the entire family would have to move in with Mrs. Cutler's sister in Georgia.

At this particularly vulnerable time in those children's educational and emotional development, it seems that that is an extraordinary price to pay.

I also find that a lengthy prison sentence would prevent Mr. Cutler from making the required payments, whether because child support payments would be excused in New York, which I don't know and do not rely on, or whether he just plain would not

be able to make them.

> For those reasons, I find that a downward departure on the basis of extraordinary family circumstances is appropriate.

> . . . .

> . . . I think that the appropriate departure is to a level 13 under the guidelines.

(Id. at 98-100.)

The court then turned to the sentencing factors set out in 18 U.S.C. § 3553(a). It stated that

> with respect to the nature and circumstances of the offense, I take into account that Mr. Cutler was the chief financial officer of the company with respect to the bank fraud conspiracy, and I take into account his responsibility for the tax documents of the company with respect to the tax fraud conspiracy.

> I note, however, that, in addition, I have defined [sic - declined] a further reduction in offense level based on Mr. Cutler's role in the offense.

> Taking into account, however, the nature and circumstances of the offense under Section [3553](a)(1), I do note, however, that the degree of culpability of Mr. Cutler is far less than the degree of culpability of other defendants. His role in the offense was far more limited than the role of other defendants and, as I mentioned, although necessary to the offense, far more limited.

> I also take into account that . . . [Cutler] received little, if any, direct compensation as a result of it and relative to the $106 million amount, a relatively small amount of compensation indirectly as a result of the bank fraud conspiracy.

> For those reasons, the nature and circumstances of the offense dictate a lower sentence than is required by the guidelines.

(Cutler S.Tr. 101-02.)

The court later clarified that these statements with respect to Cutler's role and culpability related only to the bank

- 22 -

fraud counts and that the court did "not" find that the offense level of 22 "overstat[ed] the seriousness" of Cutler's tax offenses. (See id. at 121-22.) The court ruled that "[t]o the extent that there was departure application with regard to that offense level, it is denied." (Id. at 121.)

With respect to 18 U.S.C. § 3553(a)(2)(B), which requires the sentencing court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," the district court stated,

> some jail time is required to provide adequate deterrence to this type of criminal conduct. With respect to this type of an offense, however, the relative length of the sentence does not seem to be as important in providing deterrence.

(Cutler S.Tr. 102.) The court also cited "the need to provide restitution" and stated that "in that respect, as with Mr. Cutler's family obligations, a lesser rather than greater custodial sentence is required." (Id. at 103.)

The Guidelines-recommended range of imprisonment for an offense level of 13 (the level resulting from the granted departures) and a criminal history category of I is 12-18 months. The district court sentenced Cutler to a prison term of 12 months and one day, to be followed by a five-year term of supervised release. (Id. at 103.) In response to a question from the government, the court stated that even if the Guidelines departures it had granted were found inappropriate as a matter of law on appeal, it would still sentence Cutler to the year-and-a-day term of imprisonment by imposing a non-Guidelines sentence and applying the § 3553(a) factors. (See id. at 123.)

## 2. Freedman

The PSR on Freedman, after the initial offense-level increases discussed above, i.e., 18 steps for amount of loss and two steps for more than minimal planning, leading to an enhanced offense level of 26, recommended additional increases, including, as discussed in Part II.C.1. below, a two-step increase pursuant to Guidelines § 3C1.1 on the ground that Freedman had engaged in obstruction of justice by making false statements to IRS investigators in connection with its investigation of the tax frauds. With all of the recommended increases, the PSR calculated that Freedman's total offense level was 31. Given an offense level of 31 and a criminal history category of I, the Guidelines-recommended imprisonment range for Freedman would be 108-135 months.

Freedman principally challenged the recommended loss-amount enhancement to his offense level, and he moved for downward departures on several grounds. In challenging the loss-amount enhancement, Freedman made essentially the same arguments as Cutler for exclusion of the nonrecourse parts of the loans, contending that the loss figure should be only $40-$80 million, with a resulting 17-step, rather than 18-step, increase. The government opposed these contentions on the same grounds on which it had opposed the arguments when made by Cutler.

The district court rejected Freedman's contention that the loss-amount, for purposes of calculating his offense level, should have included only the recourse part of the Tollman-Hundley debts. (See Freedman Sentencing Transcript ("Freedman S.Tr.") 53, 56; see also id. at 54 (accepting the PSR-recommended adjustment for more than minimal planning).) However, the court stated that "the

- 24 -

$100 million amount with respect to those defendants other than Mr. Hundley, and that, of course, means Mr. Freedman, substantially overstates the amount with the culpability of these defendants" and "overstates [Freedman]'s participation in the offense." (Id. at 53.) "[A]ccordingly," the court stated, "whether it's 18, as I accept, . . . or 17 as proposed by the defendants--[it] wildly overstates the culpability of the defendant." (Id.) The court "note[d] in particular that under Restr[e]po, the loss amount is in general thought to be . . . somewhat related to the gain to the defendant," and stated, "[h]ere, of course, we know that they are wildly disparate." (Id.) The court indicated that it would deal with the "vast[] overstate[ment of] this defendant's culpability in the offense" by way of a departure. (Id. at 56.)

Freedman made several applications for downward departures. In addition to moving for a departure pursuant to Guidelines § 2F1.1 Application Note 10 based on the argument that the loss amount greatly overstated his culpability in the offense, he sought a departure pursuant to § 5H1.6 for extraordinary family circumstances, arguing that his relationships with his elderly, mentally retarded brother who has cerebral palsy and with his elderly mother-in-law were so important to his family members' well-being that they merited a departure from the Guidelines. Freedman also sought a departure for health circumstances pursuant to Guidelines § 5H1.4 (Policy Statement), due to a serious heart condition (along with attendant maladies) and depression.

The government opposed all of Freedman's departure requests. As to the contention that the loss amount overstated Freedman's culpability, the government argued, inter alia, that

Freedman had benefited substantially from the frauds and that his role was extensive and significant. With respect to Freedman's family circumstances, the government pointed out that Freedman is not the primary care-giver with respect to either his brother or his mother-in-law, as each of them resides in an assisted living facility. The government contended that, if necessary, alternative arrangements could be made for the care of each, and that therefore neither situation qualified as extraordinary.

As to Freedman's heart condition, there were two stages of presentations. In response to Freedman's initial motion for a departure on this basis, the government submitted a letter from the Health Systems Administrator of the Bureau of Prisons ("BOP"), stating that the BOP was capable of providing adequate monitoring of Freedman's conditions. The letter noted that the BOP houses thousands of inmates with the same conditions as Freedman (see Part II.C.4 below), and, after elaborating on the medical facilities available in the BOP system, it asserted that "[b]ased on the information provided to me and my knowledge of BOP's medical resources, the BOP will be able to provide appropriate care for Mr. Freedman." (Letter from Barbara J. Cadogan, Health Systems Administrator, BOP, to Stanley J. Okula, Jr., Assistant United States Attorney, dated March 18, 2005 ("First Cadogan Letter"), at 2.) The government argued that a departure on the basis of Freedman's heart condition would thus not be justified.

Subsequent to these submissions and prior to sentencing, Freedman suffered a near-fatal attack of sepsis from a urinary tract infection, which required his hospitalization in intensive care for over a week. Accordingly, additional material was submitted with

respect to his request for a downward departure on account of his health. Freedman's cardiologist wrote the district court stating that the attack of urosepsis "demonstrate[d] the necessity of careful and ongoing medical care, given Mr. Freedman's cardiac condition. Without rapid attention to his deteriorating status he would not have survived." (Letter from Dennis S. Reison, M.D., to Judge Preska dated May 23, 2005 ("Reison May 23 Letter"), at 1.) Freedman's urologist wrote that Freedman's problem had been caused by kidney stones; that Freedman "will need to be watched very closely in order to make sure that he does not have a recurrence of his problem"; that a small fragment of stone remained; that "[i]f this fragment does not pass," Freedman will need to have it removed; and "until he is stone-free and until his condition is completely stabilized, that he will need to be watched closely." (Letter from Michael Wechsler, M.D., to Judge Preska dated May 10, 2005 ("Wechsler May 10 Letter").)

In response, the government summarized Freedman's medical records from his recent health problem and argued that the "medical records show that [Freedman] had a serious medical scare, but that he ha[d] essentially recovered." (Letter from Peter G. Neiman et al., Assistant United States Attorneys, to Judge Preska dated June 10, 2005 ("Neiman Letter"), at 3.) According to the summary of the medical records, after his discharge from the hospital, Freedman was essentially "'good, tolerating [a] regular diet[ and] ambulat[ing] independently without problems'" (id. (quoting Discharge Summary Note for Freedman, Sanford, by Michael Wechsler, M.D., dated April 20, 2005)), and was "'feel[ing] well,'" though "'fatigu[ing] easily,'" (Neiman Letter at 3 (quoting cardiologist's notes)). The

- 27 -

government also submitted a second letter from the BOP, which noted that it had received and assessed the additional information regarding Freedman's medical condition. The BOP concluded that "the Bureau will be able to provide appropriate care for Mr. Freedman," explaining that

> [w]hen medical emergencies and the need for surgical procedures arise, . . . major medical centers [with which the BOP has contracts] offer the Bureau a wide range of trained surgical specialists. Each institution has procedures in place to contact local emergency transportation teams for the timely transportation to one of the local medical centers. If Mr. Freedman requires hospitalization during his term of incarceration, for either a routine or emergency admission, the Bureau can accommodate this need.

(Letter from Barbara J. Cadogan, Health Systems Administrator, BOP, to Stanley J. Okula, Jr., Assistant United States Attorney, dated June 10, 2005 ("Second Cadogan Letter"), at 1.)

The district court granted Freedman's requests for departure based on his age, health, and family circumstances. The court made no determination as to what Freedman's total offense level or recommended imprisonment range would be under the Guidelines; and it did not specify the extent to which it was granting a departure on account of its view that the loss amount "vastly overstate[d Freedman]'s culpability in the offense" (Freedman S.Tr. 56 ("[r]ather than actually putting a number on it, I think I will await both the departure findings and the consideration of the 3553(a) factors")).

Notwithstanding the BOP's position that it would be able to provide adequate care for Freedman, the court granted Freedman's applications for downward departures, based in part on a "combin[ation of] Mr. Freedman's age and his health situation" (id.

at 57).  The court stated as follows:

> [T]he BOP does not have the ability, in my view, to monitor Mr. Freedman's situation constantly and to respond immediately.
>
> And the recent health issue has made it very, very plain that without that ability to monitor constantly and respond immediately, sending Mr. Freedman to prison would in effect be a death sentence. . . .
>
> I also note, of course, in the Bureau of Prisons letter that the rider suggests that, and I know it to be true, that in each facility there are contracts with outside medical facilities.  I also know it to be true, however, that one does not get the immediate monitoring and immediate response that in this instance has proved so necessary literally for Mr. Freedman's life.
>
> And I also note that the recent medical bills apparently were in excess of $200,000.  It's my experience in reviewing material from prisoners from the Bureau of Prisons that this is not the kind of outlay that would easily be expended within the Bureau of Prisons, for very obvious reasons.  But I find that a departure is appropriate.

(Id. at 58 (emphases added).)

The district court also granted a departure for extraordinary family circumstances, based on Freedman's relationships with his disabled brother and, separately, his mother-in-law.  It found that

> the defendant's relationship with his brother, Elliot, is a particularly extraordinary relationship for a variety of reasons.  First there is, of course, the length of the relationship, but there is the fact that it is a two-way relationship; the fact that, as attested to by Dr. Gibeault[, former Program Coordinator for the Department of Mental Retardation for the Commonwealth of Massachusetts], that Elliot calls Mr. Freedman several times a week at all hours of the day and night and depends upon his availability to sooth[e] whatever problem is bothering Elliot, and otherwise to provide him with a type of support that others simply cannot provide and have not provided.  That Mr. Freedman has been Elliot's foremost advocate and has achieved for him the highest possible level of independent living

- 29 -

attests to the results of this very obviously vigorous relationship.

In addition, the doctor's recitation of Mr. Freedman's including Elliot in the family events leads me to conclude that this relationship is indeed of a kind not taken into account by the guidelines.

(Id. at 59.)  With regard to Freedman's relationship with his mother-in-law, Evelyn, the district court noted that it was

tak[ing] into account Mr. Freedman's role in managing Evelyn's affairs and taking her out.  And while I find that this relationship is extraordinary to an extent not contemplated by the guidelines, it is not as extraordinary as the life-long relationship with Elliot.  But I find that both entitle Mr. Freedman to a downward departure.

(Id. at 59-60 (emphasis added).)

The district court then discussed the factors set out in 18 U.S.C. § 3553(a), and noted that

[i]n considering the nature and circumstances of the offense, I've set out most of my conclusions with respect to those factors, but reiterate here that the loss amount of $100,000[,000] very seriously overstates the participation of this defendant and his culpability in the offense.

. . . .

And I have discussed already I think at some length the history and characteristics of this defendant, particularly with respect to his age and health situation, his extraordinary family ties, his past charitable works and the like.  Certainly the history and characteristics of the defendant, most specifically his age and health situation, argue for a noncustodial sentence.  The nature and circumstances of the offense considered alone would argue for a custodial sentence.

With respect to the seriousness of the offense and promoting respect for the law, in the ordinary circumstance a custodial sentence would be required to reflect the seriousness of the offense and to promote respect for the law.

With respect to the discussion of providing just punishment for the offense, I take into account

the discussion in [Freedman]'s sentencing materials that <u>in light of the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution, both just punishment and deterrence in the general sense ha[ve] been accomplished here</u>.

Again, all other factors being equal, just punishment would ordinarily require a custodial sentence. Here I think we all agree that there is no need to protect the public from further crimes of this defendant.

With respect to [§ 3553(a)(2)(D)], the only applicable factor seems to be providing the defendant with needed medical care. The record is very clear, and as I've mentioned, <u>I find that adequate medical care for this defendant cannot be accomplished in prison</u>.

I have taken into account, and obviously counsel have made submissions regarding the kinds of sentences available, the kinds of sentences and sentencing ranges established for these offenses and the policy statements set out by the sentencing commission. I have also taken into account the need to avoid unwarranted sentence disparities among defendants with similar records and, of course, will take into account in discussing restitution the need to provide restitution to any victims of the crime.

(Freedman S.Tr. 63-64 (emphases added).) The district court proceeded to impose a sentence on Freedman that included three years of probation but no incarceration.

The court stated that it did not need to make a final ruling as to Freedman's offense-level calculation, given the difficulty of that question in light of the court's "find[ing] that the amount of the loss . . . far overstates Mr. Freedman's culpability" and the court's views as to an appropriate sentence. (<u>Id</u>. at 82.) The court stated that in light of the departures it found appropriate, "it is my view that a nonincarceratory sentence is one that I would impose in any event, regardless of what the offense level computation was," and that "consideration of the

- 31 -

3553(a) factors also would lead me to impose a nonincarceratory sentence regardless of what the outcome of the guidelines calculation, including departures, was." (Id.)

Judgment was entered sentencing Freedman to a three-year period of probation, ordering him to perform 700 hours of community service per year during the course of his probation (id. at 65, 80), and ordering him to pay restitution in the amount of $14,600,000, and to forfeit $3,013,739.48.

We note that although the judgment shows this forfeiture amount, it also states that it is based on the court's forfeiture order. The amounts listed in that order, however, total $3,080,739.48. See Order dated October 17, 2005, at 1-2. We leave it to the district court to remedy this discrepancy.

## II. DISCUSSION

In its appeals, the government contends that the district court erred or abused its discretion (a) in depreciating the seriousness of the bank fraud offenses based on the sums of money that Cutler and Freedman personally received and finding that the total amount of loss suffered by the defrauded banks overstated these defendants' roles and culpability; (b) in fashioning its sentence on Cutler without giving sufficient consideration to his conviction on the tax counts; (c) in refusing to adjust Freedman's offense level on account of, inter alia, obstruction of justice; (d) in granting these defendants downward departures for family circumstances; and (e) in concluding that Freedman could not be incarcerated because of his age and health. The government contends

that the sentences imposed, to the extent that they ordered imprisonment of no more than one year and a day for Cutler and no imprisonment at all for Freedman, are substantively unreasonable. For the reasons that follow, we conclude that there were errors in certain of the district court's Guidelines applications and in its departure decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just "punishment" and deterrence of others; and that some of the court's rationales would promote disrespect for the law.

A.   Required Sentencing Considerations and Standards of Review

In the wake of United States v. Booker, 543 U.S. 220 (2005), which ruled that the Guidelines are advisory, a sentencing judge may impose either a Guidelines sentence or a non-Guidelines sentence.  See, e.g., id. at 245-46; United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("Crosby").  In arriving at either type of sentence, the sentencing judge must consider the factors set forth in 18 U.S.C. § 3553(a).  That section provides in pertinent part as follows:

> (a)   Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

. . . .

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission . . . ;

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code . . . ;

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(4)(A)(i), (a)(5)(A), (a)(6), and (a)(7).

Recent decisions by the Supreme Court have clarified both the procedures to be followed by the district court in arriving at either type of sentence and the standard of review to be applied by the courts of appeals. See, e.g., Gall v. United States, 128 S. Ct. 586, 594, 596-97 (2007); Kimbrough v. United States, 128 S. Ct. 558, 570, 574-75 (2007); Rita v. United States, 127 S. Ct. 2456, 2467-68 (2007). Because "§ 3553(a) explicitly directs sentencing courts to consider the Guidelines,"

district courts must begin their analysis with the Guidelines and remain cognizant of them throughout

the sentencing process.

*Gall*, 128 S. Ct. at 597 n.6. The *Gall* Court elaborated that

> [a]s we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See . . . 127 S.Ct. 2456. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.

*Gall*, 128 S. Ct. at 596.

In *Kimbrough*, which dealt with the disparities between sentences prescribed for powder cocaine and crack cocaine, the Court stated that

> as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines. . . . [C]f. *Rita v. United States*, [127 S. Ct. at 2465] (2007) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

*Kimbrough*, 128 S. Ct. at 570 (bracketed phrase in original) (other internal quotation marks omitted). In *Gall*, the Court noted that it is

> clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications. For even though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.

*Gall*, 128 S. Ct. at 594 (emphases added); *see Rita*, 127 S. Ct. at

- 35 -

2464. Thus,

> [i]f [the sentencing judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. . . . <u>[A] major departure should be supported by a more significant justification than a minor one</u>.

Gall, 128 S. Ct. at 597 (emphasis added). Finally,

> [a]fter settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review <u>and to promote the perception of fair sentencing</u>.

Id. (emphasis added); Rita, 127 S. Ct. at 2468.

In the wake of Booker, this Court is to apply a "reasonableness standard" in reviewing sentences, Booker, 543 U.S. at 262 (internal quotation marks omitted); "'reasonableness' review merely asks whether the trial court abused its discretion," Rita, 127 S. Ct. at 2465; see, e.g., Gall, 128 S. Ct. at 594 ("Our explanation of 'reasonableness' review in the Booker opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions. See [Booker,] 543 U.S., at 260-262 . . . ."). Thus,

> [r]egardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, <u>selecting a sentence based on clearly erroneous facts</u>, or <u>failing to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range</u>. Assuming that the district court's sentencing decision is procedurally sound, <u>the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard</u>. <u>When conducting this review, the court will, of course, take into account</u>

the totality of the circumstances, including the extent of any variance from the Guidelines range. . . . [I]f the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.

Gall, 128 S. Ct. at 597 (emphases added); see id. at 594-95 (While generally the district court need not have found "'extraordinary' circumstances to justify a sentence outside the Guidelines range," an appellate court "reviewing the reasonableness of a sentence outside the Guidelines range, . . . may . . . take the degree of variance into account and consider the extent of a deviation from the Guidelines."). And

while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range "fails properly to reflect § 3553(a) considerations" even in a mine-run case.

Kimbrough, 128 S. Ct. at 575 (quoting Rita, 127 S. Ct. at 2465).

In making our assessment of a sentencing decision, we bear in mind the "familiar abuse-of-discretion standard of review." Gall, 128 S. Ct. at 594 (citing Booker, 543 U.S. at 260-62). At the cited pages of Booker, the Court embraced the standard established by Koon v. United States, 518 U.S. 81, 99 (1996), which in turn had endorsed the approach taken in Pierce v. Underwood, 487 U.S. 552, 558-60 (1988), and had "adopt[ed] the abuse-of-discretion standard in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990)," Koon, 518 U.S. at 99. The Booker Court indicated that, although 18 U.S.C. § 3553(a) did not explicitly set forth a standard of review, the abuse-of-discretion standard was inferable "from related statutory

language, the structure of the statute, and the 'sound administration of justice.'" Booker, 543 U.S. at 260-61 (quoting Pierce, 487 U.S. at 559-60) (other internal quotation marks omitted).

As to the elements of abuse-of-discretion review, Koon pointed out that a district court's discretion is not boundless. For example,

> whether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point. . . . [A]n abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. Cooter & Gell, [496 U.S.] at 402. A district court by definition abuses its discretion when it makes an error of law. [Id.] at 405. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.

Koon, 518 U.S. at 100 (emphasis added).

Further, as noted in Cooter & Gell, a district court's findings of fact, while accorded deference, are likewise subject to review:

> When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous.

Cooter & Gell, 496 U.S. at 401. "A district court would necessarily abuse its discretion if it based its ruling . . . on a clearly erroneous assessment of the evidence." Id. at 405.

In addition, we have noted that even where the decision is not necessarily the product of an error of law or a clearly erroneous finding of fact,

[a] sentencing court abuses or exceeds its discretion when its decision . . . "'cannot be located within the range of permissible decisions.'" [United States v.] Brady, 417 F.3d [326, 333 (2d Cir. 2005)] (quoting Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001)).

United States v. Canova, 485 F.3d 674, 679-80 (2d Cir. 2007). See, e.g., Crosby, 397 F.3d at 114 (district court has abused its discretion if "the decision on its merits exceeded the bounds of allowable discretion"); Eastway Construction Corp. v. City of N.Y., 821 F.2d 121, 123 (2d Cir. 1987) ("All discretion is to be exercised within reasonable limits. The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; at the same time, a decision outside those limits exceeds or, as it is infelicitously said, 'abuses' allowable discretion.").

As to substantive reasonableness, Booker instructed that "[s]ection 3553(a) . . . sets forth numerous factors that guide sentencing. Those factors [are to] guide appellate courts . . . in determining whether a sentence is unreasonable." 543 U.S. at 261. Accordingly, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range," in order to determine whether a sentence is substantively unreasonable, i.e., an abuse of discretion, Gall, 128 S. Ct. at 597, we look to see whether the sentencing court erred in interpreting any of the § 3553(a) factors or made any other error of law, whether it made any clear error in assessing the evidence, and whether its decision was beyond the outer limits of the range of decisions permitted by § 3553(a).

B.  Cutler

With respect to the sentencing of Cutler, our review of the record persuades us that the district court erred by disregarding the Guidelines provision addressing a defendant's culpability for jointly conducted activity, by exceeding its departure authority, and by misinterpreting certain of the § 3553(a) factors.  In addition, certain of the court's findings are clearly erroneous, and certain of its rationales are detrimental to the "perception of fair sentencing," Gall, 128 S. Ct. at 597.

1.  Departure on the Theory that the Loss Amount Overstated Cutler's Role, Culpability, and Gain With Respect to the Bank Frauds

The district court's departure on the ground that the loss amount overstated Cutler's role in and culpability for the bank fraud offenses reflects a misapplication of the guidelines relating to a defendant's responsibility for losses caused by activity in concert with others and a misapprehension of its departure authority with respect to role.  See generally United States v. O'Neil, 118 F.3d 65, 75 (2d Cir. 1997) ("O'Neil") ("loss measur[es] the gravity of the offense, while the role adjustment measur[es] the culpability of a defendant's conduct in the commission of the offense") (internal quotation marks omitted), cert. denied, 522 U.S. 1064 (1998).

As to the amount of loss for which a defendant is personally responsible, the guidelines as to relevant conduct, see Guidelines § 1B1.3 ("Factors that Determine the Guideline Range"), provide, inter alia, that in "'the case of a jointly undertaken

criminal activity,'" such as a conspiracy to commit fraud, the amount of loss attributable to a defendant is the reasonably foreseeable pecuniary loss caused by all "'reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" O'Neil, 118 F.3d at 74 (quoting Guidelines § 1B1.3(a)(1)(B)). Although there may be unusual cases in which the record reveals a combination of circumstances that warrant a departure from the application of this principle, any finding of such circumstances in this case--had one been made--would be clearly erroneous. As discussed below, there can be no doubt that Cutler's fraudulent representations to the banks were part of the conspiracy among Tollman, Hundley, Freedman, Zukerman, Cutler, and others, to cause the banks to sell more than $100 million worth of loans for a small fraction of their outstanding balances. The coconspirators set out to, and did, inflict on the victim banks losses totaling more than $106 million. In light of the fact that Cutler not only could foresee losses in that magnitude but also was well aware that losses in that magnitude were intended, the court, in departing on the ground that the amount of loss was disproportionate to the seriousness of Cutler's conduct and offense, failed to apply the principle set forth in § 1B1.3(a)(1)(B).

As to a defendant's role in the offense, § 3B1.2 of the Guidelines provides for either a two-step or a four-step reduction of the offense level of a defendant who is found to have "play[ed] a part in committing the offense that makes him substantially less culpable than the average participant." Guidelines § 3B1.2 Background (emphasis added). Under § 3B1.2(b) a two-step "minor" role adjustment is available for a defendant "who is less culpable

- 41 -

than most other participants, but whose role could not be described as minimal." Guidelines § 3B1.2 Application Note 3 (emphasis added). Thus, as a general matter, the Sentencing Commission has taken into consideration that a defendant may play a lesser role in the offense than his coparticipants played or than the average participant would play.

In granting a departure to Cutler on the ground that the offense level resulting from the sizeable loss overstated his role, the court stated that it viewed this case as "analogous to the Court of Appeals decision in United States v. Restrepo." (Cutler S.Tr. 97.) See United States v. Restrepo, 936 F.2d 661 (2d Cir. 1991) ("Restrepo"). Given the facts of Restrepo, we find the analogy inapt. Restrepo arose from the government's seizure of, inter alia, $18,300,000 in cash narcotics proceeds; the sentencing court found that the offense levels calculated by reference to that amount of money overstated the roles of three defendants who were merely "laborers whose sole function was to load the boxes of money at the warehouse on [a particular date]." Id. at 667 (internal quotation marks omitted); see, e.g., id. at 668 ("[T]he probation department, after interviewing the surveillance agent and reviewing the facts of the case, concluded that the roles of Andrade, Martinez, and Lara were limited to loading the boxes of money."). The Restrepo district court found those three defendants to be at most minimally culpable, and it thus lowered their offense levels to the full extent provided by § 3B1.2. It concluded that, in addition, a four-level downward departure was warranted because the effect that the amount of cash seized had on the offense levels of participants whose roles were so de minimis was far beyond that contemplated by

- 42 -

the Sentencing Commission in fashioning the Guidelines. This Court affirmed on the ground that the "offense level ha[d] been extraordinarily magnified" and that the amount of money involved "b[ore] little relation to th[os]e defendant[s'] role in the offense." Id. at 667.

In the present case, the district court's departure on the ground that Cutler's role was overstated is inconsistent both with the bases for our affirmance of the departure in Restrepo and with the proper confines of departures. First, the district court in Restrepo had adjusted the three defendants' offense levels downward pursuant to § 3B1.2(a), i.e., as far as the Guidelines permitted for minimal participation; thus that court was justified in viewing the Sentencing Commission as not having made adequate provision for participation that was even less than minimal. Here, in contrast, the district court did not find Cutler's participation minimal; it found that Cutler's role could not be regarded as even minor. If Cutler's role were significantly less than that of the average participant in such an offense, the Guidelines made adequate provision for a reduction in his offense level. Accordingly, we conclude that departure on this basis constituted a misinterpretation of Restrepo, as well as a misapplication of the Guidelines.

Second, to the extent that the district court here concluded that this case was analogous to Restrepo by finding that the large amount of money lost bore little relation to Cutler's role in the offense, that finding is clearly erroneous. The magnitude of the losses suffered by the defrauded banks was precisely what the coconspirators intended, and there can be no doubt that Cutler knew

- 43 -

the goal and that he took significant steps to help achieve it. As chief financial officer of Tollman-Hundley, Cutler was of course aware of the size of the Tollman-Hundley debt and of the personal liability of Tollman and Hundley on the deficiency notes they had given in order to restructure the Tollman-Hundley debt. Those notes made Tollman and Hundley personally liable for approximately $100 million of Tollman-Hundley's debt; Cohen was instructed to negotiate to purchase the targeted banks' loans for 20 cents or less on the dollar. The frauds were thus explicitly designed to induce the banks to sell their Tollman-Hundley loans at losses in excess of $80 million.

Aware of the magnitude of Tollman's and Hundley's exposure, Cutler made significant misrepresentations to persuade the banks that Tollman and Hundley had little in the way of personal assets, and we see no error in the district court's denial of Cutler's request to lower his offense level on the basis that he played only a minor role. Although Cutler may not have been involved in the everyday communications with the banks that the coconspirators were attempting to defraud, his position as chief financial officer of Tollman-Hundley made him a natural person for the banks to contact for information when they could not get information from Zukerman and Freedman. The record shows that in response to repeated inquiries from banks that refused to sell their loans cheaply without additional information, Cutler wrote several letters to creditor banks, sending what he represented were the most recent financial statements of Tollman and/or Hundley. The statements that Cutler sent in mid-1995, for example, showed Tollman and Hundley as having assets of little more than $125,000 and

$80,000, respectively, when at the same time Cutler was overseeing Tollman's application to the Mississippi Gaming Commission representing that Tollman had a net worth of more than $27 million. The documents that Cutler sent to the banks concealed assets of Tollman totaling $31,592,019 (see GX 1501) and concealed assets of Hundley totaling $25,640,795 (see GX 1500).

Had Cutler not participated in the frauds but given the banks true information as to the personal assets of Tollman and Hundley, the frauds would not have succeeded. The district court accordingly found that Cutler was not a minor participant because his actions were "necessary" (e.g., Cutler S.Tr. 98), and indeed "critical[]" (id. at 29), to the success of the bank fraud conspiracy. The court's departure on the ground that the amount of loss overstated Cutler's role in the bank fraud offenses was inconsistent with these findings and with its appropriate refusal to find that Cutler was either "less culpable than most other participants," as specified in Guidelines § 3B1.2 Application Note 3, or "substantially less culpable than the average participant," as specified in the Guidelines § 3B1.2 Background.

In sum, the coconspirators' explicit goal--reflected in the list of banks, with loan balances and purchase price targets, that was given to Cohen--was to induce banks that held Tollman-Hundley loans with balances totaling more than $100 million to sell their loans for 20 percent or less of those balances. Freedman and Zukerman represented that Tollman-Hundley itself and Tollman and Hundley individually would consider filing for bankruptcy if they could not get all the creditor banks to sell the loans cheaply; and Cutler supported those misrepresentations by sending the banks

- 45 -

schedules that failed to disclose a total of more than $57 million, or more than 99 percent, of Tollman's and Hundley's assets. We conclude that, in departing on the ground that the $106 million loss resulted in an offense level that overstated either Cutler's conduct or his role in the offense, the district court misinterpreted the Guidelines in concluding that it had authority to depart downward on the basis of a role that could not be considered either minimal or minor, made an error of law in disregarding the principle that a defendant is to be charged with the reasonably foreseeable losses caused by his own conduct and the reasonably foreseeable conduct of his coconspirators, and clearly erred in finding that the magnitude of the banks' losses overstated Cutler's conduct and role, given that his fraudulent statements to the banks were intended to defraud them of those amounts and were, as the court found, critical to the success of the fraud.

To the extent that the court viewed the loss calculation as overstating the seriousness of the offense itself (see Cutler S.Tr. 97-98), we see no basis in the Guidelines--or in fact--for such a view. Although the commentary to Guidelines § 2F1.1 states that "[i]n a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense" and warrant a downward departure, Guidelines § 2F1.1 Application Note 10, the example given--an "attempt[] to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it," id.--plainly relates to intended loss, not to realized loss. "The example suggests that this departure typically applies in cases where there is no meaningful chance that the attempted crime would have succeeded to the extent indicated by the stated loss," that is,

- 46 -

"where the intended loss is almost certain not to occur." Canova, 485 F.3d at 680 (internal quotation marks omitted). That commentary to § 2F1.1 has no applicability here. The $106 million in losses not only were intended but were realized. The coconspirators set out to induce the creditor banks to sell their loans at losses of more than $80 million, and they did.

In sentencing Cutler to a prison term of only 12 months and one day for his bank fraud crimes, rather than the advisory-Guidelines-recommended term of 78-97 months, the court sentenced Cutler as if the frauds had resulted in losses of little more than $70,000. The court stated that

> some jail time is required to provide adequate deterrence to this type of criminal conduct. With respect to this type of an offense, however, the relative length of the sentence does not seem to be as important in providing deterrence.

(Cutler S.Tr. 102 (emphases added).) The implicit finding that a fraud causing losses of more than $100,000,000 is no more serious than one causing losses of little more than $70,000 reflects an erroneous interpretation of § 3553(a)(2)(A)'s requirement for punishment that is "just" and is antithetical to the need to "promote the perception of fair sentencing," Gall, 128 S. Ct. at 597.

Finally we reject the district court's determination that Cutler should be granted a departure on the basis that he "received little, if any, personal gain from the bank fraud scheme" (Cutler S.Tr. 98), as that finding, given the present record, is clearly erroneous. Preliminarily, we note that a defendant's lack of personal profit from the offense of conviction is not ordinarily a ground for departure. See, e.g., United States v. Broderson, 67 F.3d

452, 459 (2d Cir. 1995) ("Broderson"). Although we found the defendant in Broderson worthy of an exception to this general rule, we did so principally not only because Broderson had not profited personally from the fraud, but also because his conduct was not "mainstream fraud" but was fraud only because of an unusual statutory provision (requiring that the government be given the benefit of a government-contractor's subsequently negotiated lower costs), and because Broderson had not set out to perpetrate a fraud. See id.

This case bears little resemblance to Broderson. The bank fraud conspiracy here was an unadulterated effort to induce creditor banks to part with their property for a small fraction of its fair value. The frauds were perpetrated through, inter alia, express misrepresentations, an elaborate set of front-men and sham entities (whose façade of lack of affiliation with Tollman and Hundley was assisted by Cutler's having Paternoster's tax documents signed by front-man Smith), false threats that Tollman and Hundley would file for bankruptcy, and Cutler's sending the banks financial schedules that concealed more than 99 percent of Tollman's and Hundley's personal assets.

The PSR concluded that Cutler had been motivated by monetary gain, and the district court found that both Cutler's salary during the period of the bank fraud conspiracy (totaling more than $970,000) and his receipt of stock in the casino venture (worth more than $400,000) resulted from his participation in the bank fraud conspiracy. At the sentencing hearing, the court began by noting that

the clear language of 18, U.S.C., Section 982(a)(2)

- 48 -

requires that the forfeiture amount be limited to property [or substitute property] constituting or derived from the proceeds the defendant obtained directly or indirectly as a result of the violation, here, the bank fraud conspiracy[, and]

. . . that the clear language of the statute requires that at some point in time the defendant must have directly or indirectly, physically or constructively, come into possession of those proceeds.

(Cutler S.Tr. 105.)  The court concluded:

That having been said, it is my intention, taking into account the evidence in the case, to require forfeiture of Mr. Cutler's salary amounts during the years in question and the amount of substitute property of the value of his Alpha Hospitality stock . . . .

(Id. at 106.)  The district court's subsequent forfeiture order ruled that the "proceeds obtained by [Cutler] as a result of the [bank fraud and bank fraud conspiracy offenses of which he was convicted]" totaled "$1,381,974."  Final Order of Forfeiture as to James Cutler dated April 15, 2005, at 2.  Although this was the equivalent of but a small percentage of the banks' total $106 million loss, it is clearly erroneous--and hardly promotes respect for the law--to characterize an individual's $1.3 million profit from crime as "little, if any, personal gain" (Cutler S.Tr. 98).

2.    Departure on the Theory that the Length of Sentence Is Relatively Unimportant in Providing Deterrence

In imposing sentence on Cutler, the court generally dealt with his bank fraud offenses and his tax offenses jointly, stating, "I am only going to [explain the reasons for the extent of the departure] once instead of twice" (Cutler S.Tr. 100).  After giving its explanations, the court clarified that its departure on the

basis that the Guidelines-recommended range of imprisonment "overstat[ed] the seriousness" of Cutler's offenses was not meant to apply to his tax offenses. (Id. at 121-22.) The court did not make a similar disavowal with respect to its rationale that "[w]ith respect to this type of an offense, . . . the relative length of the sentence does not seem to be as important in providing deterrence" (id. at 102).

To the extent that the district court's views that this "type" of offense did not warrant a long sentence and that the relative length of the sentence was relatively unimportant in providing deterrence were meant to apply to Cutler's convictions for tax evasion and tax fraud conspiracy, the court's views were squarely contrary to the policy judgments articulated by the Sentencing Commission. The Commission stated that

> [t]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

Guidelines Ch. 2, Pt. T, 1, Introductory Commentary (emphasis added). Accordingly, the guidelines for tax offenses provide a scale of recommended prison ranges that increase with the size of the loss. See Guidelines § 2T1.1 (base offense level for offense resulting in a tax loss is the "[l]evel from §2T4.1 (Tax Table) corresponding to the tax loss"). The commentary to § 2T1.1 states that

> [t]his guideline relies most heavily on the amount of loss that was the object of the offense. <u>Tax offenses, in and of themselves, are serious offenses</u>; however, <u>a greater tax loss is</u> obviously more harmful to the treasury and <u>more serious than a smaller one</u> with otherwise similar characteristics. Furthermore, <u>as the potential benefit from the offense increases, the sanction necessary to deter also increases</u>.

Guidelines § 2T1.1 Background (emphases added).

Cutler's tax offenses resulted in tax losses of more than $5 million. In the Sentencing Commission's view, the tax offenses of which Cutler was convicted are the type of offense for which the length of prison term is especially related to the need for deterrence. His offense level for those convictions alone would have been 22, and his recommended range of imprisonment for those offenses alone would have been 41-51 months.

Although, as discussed above, a sentencing court is allowed to impose a sentence that varies from the Guidelines based solely on policy considerations, including disagreements with the Guidelines, the court is required by § 3553(a)(4) to consider the pertinent Guidelines, and it is required to state the basis for its disagreement, along with "sufficient justifications" for "the extent of any departure," <u>Gall</u>, 128 S. Ct. at 594. Here, the court gave no explanation for its disagreement with the Commission's policy judgments, reflected in the Guidelines as explained by the background commentary, that tax offenses, in and of themselves, are serious offenses; that the greater the tax loss, the more serious the offense; and that the greater the potential gain from the tax offense, the greater the sanction that is necessary for deterrence. The court's conclusory statement that "the relative length of the sentence does not seem to be as important in providing deterrence"

(id. at 102) provided no explanation whatever.

Thus, if the court intended its statement to apply to Cutler's tax offenses, this rationale constituted procedural error because it failed to provide an adequate explanation for the disagreement, the departure, or the extent of the departure. If, instead, the court did not mean this statement to apply to the tax offenses, we see in the record no indication that the court in fact gave the requisite consideration to the guidelines relating to Cutler's tax offenses as was required by § 3553(a)(4). In the absence of any explanation by the court, we conclude that the prison term of 12 months and one day--even if all of that term were attributable to Cutler's tax frauds, and none of it were attributable in part to his participation in the $100 million bank frauds--was not commensurate with the seriousness of the offense, would not act as a deterrent to would-be violators, did not promote respect for the tax laws, and was substantively unreasonable.

### 3. Departure Based on Cutler's Family Circumstances

"Family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Guidelines § 5H1.6 (Policy Statement). This policy statement was mandated by Congress in the Sentencing Reform Act, which instructed that "in recommending a term of imprisonment or length of a term of imprisonment," the Commission "shall assure that" the Guidelines and policy statements "reflect the general **in**appropriateness of considering the . . . family ties and responsibilities . . . of the defendant." 28 U.S.C. § 994(e)

(emphasis added). Accordingly, "[b]ecause the Guidelines disfavor departure based on family responsibilities, such a departure is not permitted except in extraordinary circumstances." United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003) ("Smith").

We have found family circumstances to be extraordinary, and hence a permissible basis for departure, where the defendant provided substantial support for two children, his wife spoke limited English and had a limited earning capacity, and his elderly parents were likely to require both physical and financial assistance in the near future, see United States v. Galante, 111 F.3d 1029, 1035 (2d Cir. 1997) ("Galante"); where the defendant was the sole support of several young children, one of whom was an infant, see United States v. Johnson, 964 F.2d 124, 129-30 (2d Cir. 1992) ("Johnson"); and where the defendant supported his wife, two children, his paternal grandmother, and his disabled father who depended also on the defendant's physical strength to help him get in and out of his wheelchair, see United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) ("Alba").

"It is not unusual, however, for a convicted defendant's incarceration to cause some hardship in the family." Smith, 331 F.3d at 294. We have found that family circumstances departures were unauthorized in circumstances less compelling than those in Galante, Johnson, and Alba,

> especially where other relatives could meet the family's needs, see United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003), or the defendant's absence did not cause a "particularly severe" hardship, United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003).

United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005).

- 53 -

In Smith, for example, we found a family-circumstances departure not authorized where it was based on the facts that the defendant had a two-year-old son with whom he had a close relationship and in whose daily care he played a major role; that his wife attended college part-time and would be forced to stop if the defendant were incarcerated; and that his wife's job netted approximately $17,000 a year after taxes, which was less than the family's total expenses for rent and child-care. We noted that Smith was neither the sole care-giver for his son nor the sole financial support of the family, and that Smith's mother and half-sister lived nearby and could assist in child care. Although Smith's wife was likely to be forced to interrupt her college studies and would need to supplement her income, the facts before the court were simply "not the sort of extraordinary hardship that justifies downward departure for family circumstances." Smith, 331 F.3d at 294.

We have also found such a departure impermissible in a case in which the defendant was a recently-divorced father of three children, aged 10, 11, and 13; the children lived with their mother; the mother earned approximately $40,000 annually; and the defendant had been contributing roughly $278 per week in child support payments. See United States v. Faria, 161 F.3d 761, 762-63 (2d Cir. 1998). We concluded:

> The financial and emotional consequences of Faria's incarceration are no greater than those faced by most criminal defendants who have a family, and in fact may be somewhat less serious than those faced by many such defendants--although Faria pays child support, he no longer lives with his children, and his ex-wife earns approximately $40,000 per year. Under these circumstances, we cannot conclude that Faria's family is uniquely dependent on the support

_it currently receives from him_. At a minimum, it is clear that the facts presented in Faria's case are far less grave than those that led us to approve the downward departures granted to the defendants in Alba, Johnson, and Galante.

Id. at 763 (emphasis added).

We see little difference between Faria and the present case. The core factual findings made by the district court to support granting Cutler a downward departure for extraordinary family circumstances were that he had three children, a 20-year-old in college, and a 14-year-old and an 11-year-old in public school; that his ex-wife's salary was approximately $25,000; that Cutler had contributed $1,900 per month to the children's support; and that if Cutler were incarcerated for a period commensurate with his crime and unable to continue that support, the 20-year-old would likely be prevented from returning to college, and the other two children might have to leave the school system they had attended and move with their mother to live with her sister in Georgia. Although the district court referred to this as a "particularly vulnerable time in those children's educational and emotional development" (Cutler S.Tr. 99), it gave no explanation as to why that was so. The only facts found were Cutler's ex-wife's modest salary and the likelihood that the cessation of Cutler's financial contributions would interrupt the 20-year-old's college education and cause the family to move away to live with a relative. Cutler's wife and children will no doubt face hardship, but this is true whenever family members are deprived of the company and/or support of a defendant who is incarcerated. The facts found by the district court do not take this case sufficiently out of the mainstream of family hardships to warrant a downward departure.

More importantly, the record did not support a finding that the imposition of a substantial prison term on Cutler would cause him to be unable to support his children during the period of his incarceration. In the district court proceedings, the government contended that if in fact Cutler is unable to support his children while he is in prison, it is because he sold the casino venture stock he had been given for his role in the bank frauds, had used the proceeds to buy land in Nevada, and had placed that property in the name of his new wife Erika, beyond the reach of his ex-wife and his children. The district court did not make a finding on this contention. At the sentencing hearing, however, the court noted that in view of the fact "that Mrs. Erika Cutler had not been employed earning a great deal" (Cutler S.Tr. 33), it was "highly unlikely that Mrs. Erika Cutler contributed in any material way financially to that company which she owns" (id. at 35). The court asked, "[w]here did the initial capital come from" to buy the land. (Id. at 33.) Although Cutler took the position that the land had been bought solely with a bank loan, not with the proceeds of the sale of the casino stock, his attorney's statements at the hearing included the following:

- "They created a new business that is in his wife's name" (id. at 35);

- Erika Cutler did not contribute anything financially to the property that is now in her name (see id. at 35-36);

- after getting the bank financing for the new business in his wife's name, "Cutler did lend money to it, which he lost" (id. at 36);

- "They structured the business . . . . The asset is in his wife's name. There is no question about that." (Id. at 33, 34);

- "Erika Cutler owns these properties, . . . he owns the

management company, . . . he earns money in the management company" (id. at 75); his earning any money "is very unlikely without his personal services" (id. at 36);

- They structured the business so that it could continue to operate if Cutler went to jail: "Cutler and his wife set up a business to provide for his wife . . . while he is away"; he would "provide for his children by working" when "he is out" (id. at 35 (emphases added)).

Thus, the government's position, i.e., that it was Cutler's choice to put his assets in the name of his new wife that leaves him unable to support his children while he is in prison, was supported by the plain implication of the above statements by Cutler's attorney at sentencing, i.e., that the Nevada property into which Cutler put money (whether as equity or debt, and regardless of whether or not that money was proceeds from the bank frauds) is capable of providing an income stream while Cutler is in prison. That Cutler chose to put the property into his new wife's name to provide for her, rather than leaving it in his own name to provide for his children, may be an exceptional circumstance, but it is surely not one that authorizes a downward departure. Allowing a defendant to elude the vast majority of the prison term that is appropriate for his crime, by putting his assets out of the reach of his children and then pleading the need to be out of prison in order to support them, can only promote disrespect for the law.

4. Departure Based on the Need for Restitution

Finally, in imposing on Cutler a term of imprisonment that was a small fraction of the recommended term, the district court stated that "the need to provide restitution," as well as "Mr. Cutler's family obligations," led to the conclusion that "a lesser

- 57 -

rather than greater custodial sentence is required" (Cutler S.Tr. 103). In light of the record in this case, including that discussed in the immediately preceding section, we conclude that the court's emphasis on the need to provide restitution could not rationally provide the necessary justification for reducing Cutler's sentence from 78-97 months to 12 months and a day.

For example, the court's reliance on the proposition that Cutler's ability to pay restitution would be impaired unless he received a sentence of imprisonment to a term that is shorter than what would be commensurate with his crime would appear to subvert the principle that the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). An even-handed application of the principle that a short prison term was required for Cutler because of his restitution obligations would imply that virtually all defendants who are required to pay restitution in amounts exceeding their net worth should receive short prison terms, a proposition that is patently untenable.

Further, any suggestion that even the restitution objective of sentencing would be achieved by sentencing Cutler to serve a prison term of not more than a year and a day is highly unrealistic. Cutler claims that he lacks the wherewithal to provide even $1,900 per month to support his children. The amount of restitution that Cutler is ordered to pay is $29,775,000. Objectives of sentencing such as the need for deterrence and the need to promote respect for the law are hardly served by imposing a term of imprisonment that is a small fraction of the period appropriate for the defendant's offense simply because there is an

order for restitution, no more than a small fraction of which the defendant is likely to pay.

C. Freedman

In sentencing Freedman, who was convicted on 12 counts relating to the bank frauds (including one count of perjury resulting from his testimony about the "concern" of Tollman and Hundley that Paternoster, which they owned, might try to collect from them on their deficiency notes), the district court rejected the PSR's recommendation that Freedman's offense-level be increased for, inter alia, obstruction of justice; it granted Freedman downward departures on the grounds that Freedman had extraordinary family circumstances, was aged, and was in poor health; and it appears to have granted a departure on the ground that the offense level resulting from the size of the banks' losses overstated Freedman's participation and culpability in the offenses. In sentencing Freedman to no term of imprisonment, the court stated that it would arrive at this result either as a Guidelines sentence or as a non-Guidelines sentence. We conclude both that there were procedural errors and that the resulting sentence was substantively unreasonable.

1. Refusal To Consider an Obstruction-of-Justice Adjustment

The Guidelines recommend a two-step increase in a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Guidelines § 3C1.1. Among the acts that fall

- 59 -

within this Guideline is "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Id. Application Note 3(g). In order to impose the adjustment, the district court must find that the defendant consciously acted with the purpose of obstructing justice; but the pertinent facts need be proven only by a preponderance of the evidence. See, e.g., United States v. Agudelo, 414 F.3d 345, 349 (2d Cir. 2005); United States v. Mafanya, 24 F.3d 412, 414 (2d Cir. 1994).

In the present case, the PSR on Freedman recommended, and the government requested, an obstruction adjustment on the ground that Freedman had made false statements to IRS investigators with respect to Freedman's knowledge of the tax frauds, in an attempt to impede the investigation of those frauds. The government argued that Freedman's statements to the IRS agents had substantially impaired the investigation into the tax fraud and thereby obstructed justice within the meaning of § 3C1.1. Freedman contended that such an adjustment was inappropriate because he did not lie to the investigating IRS agents and that, in any event, his statements did not obstruct the investigation.

The district court rejected the recommended obstruction-of-justice adjustment stating as follows:

there was originally a charge to this effect. And I believe it is the case, and I know the government will correct me if I'm wrong, that following the evidentiary ruling that not just the statements alleged to have been false from an agent's report could be shown to the jury, but the material in the report surrounding those statements, that charge was withdrawn. So for that reason I reject [the obstruction-adjustment recommendation] of the presentence report.

(See Freedman S.Tr. 55 (emphases added).) The court did not make any findings as to whether or not Freedman had made false statements or, if he had, whether those statements were intended to impede or had the effect of impeding the IRS investigation.

The court's rejection of the obstruction adjustment on the stated ground reflects an error of law. "Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker," United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005), and "a preponderance of the evidence is the appropriate standard to be used in considering uncharged relevant conduct for sentencing purposes," United States v. White, 240 F.3d 127, 136 (2d Cir. 2001) (so stating in the wake of Apprendi v. New Jersey, 530 U.S. 466 (2000)). The fact that the government elected not to have the obstruction count submitted to the jury at trial, where the government's burden would have been to prove the relevant facts beyond a reasonable doubt, did not provide a basis for the court to refuse to consider the adjustment at sentencing, where those facts need be proven only by a preponderance of the evidence. The court's decision that it need not consider the proposed obstruction adjustment was erroneous as a matter of law.

2. Departure on the Theory that the Loss Amount Overstated Freedman's Participation and Culpability in, and His Gain from, the Bank Frauds

Although the district court stated that it accepted the PSR's determination that Freedman's base offense level was 6 and should be increased by two steps for more than minimal planning and by 18 steps for the $106 million loss amount (see Freedman S.Tr. 53, 54, 56), the court consciously declined to make a finding as to an

- 61 -

actual total offense level for Freedman (see, e.g., id. at 82). This, in itself, was an error of the type mentioned in Gall. See 128 S. Ct. at 597 ("significant procedural error[s]" include "failing to calculate . . . the Guidelines range").

Instead, the court made findings similar to those made with respect to Cutler, to wit, that the "$100 million amount . . . substantially overstates . . . the culpability of" the "defendants other than Mr. Hundley" (Freedman S.Tr. 53), and that the 18-step increase resulting from that loss amount "overstate[d Freedman's] participation in the offense" (id.) and "vastly" and "wildly" overstated his "culpability" (id. at 56, 53). Although the court stated that it would deal with the effect of the loss amount by means of departure (see id. at 56), relying on "Restr[e]po" (id. at 53) and "consideration of the 3553(a) factors" (id. at 56), the court never actually stated the degree to which it departed on this basis.

To the extent that the court departed at all based on its view that the banks' loss overstated Freedman's culpability for participating in the bank fraud conspiracy, we conclude that that decision was error, essentially for the reasons discussed in Part II.B.1. above with respect to Cutler. The court's view that the "$100 million amount . . . substantially overstates . . . the culpability of" the defendants other than Hundley disregarded the principle set forth in Guidelines § 1B1.3(a)(1)(B) that a coconspirator is to be held responsible for the reasonably foreseeable amount of loss resulting from the reasonably foreseeable acts of all of the coconspirators. Here, the massive losses incurred by the banks not only were foreseeable, they were the

- 62 -

express goal of a highly orchestrated conspiracy.

Further, Freedman's participation in that conspiracy was pervasive. For example, Freedman, along with Tollman, Hundley, and Zukerman, made the initial contacts with Tollman-Hundley's creditors in early 1993 to represent that Tollman and Hundley were having great financial problems. Freedman attended several meetings with Marine Midland at which he and Zukerman repeatedly represented that Tollman and Hundley lacked "the financial wherewithal to meet the[ir] obligations." (Trial Tr. 2072; see also id. at 2068-71.) Freedman introduced Cohen to representatives of Chemical Bank to facilitate Cohen's attempt to negotiate the purchase of Tollman-Hundley loans from that bank and attended Cohen's first meeting with representatives of that bank. (See id. at 3759-60.) Freedman instructed Cohen on how much to offer Bank of America on its loans. (See id. at 3768.) Cohen reported to Hundley and Freedman on the progress of Cohen's negotiations with the banks (see id. at 3751), having concealed the true identity of his principals as instructed by Hundley and Freedman.

At the time Freedman was making representations to the banks that Tollman and Hundley lacked the financial ability to meet their deficiency-note obligations, he was plainly aware of the value of Tollman's and Hundley's assets; he had between a 2.5 and a 4.75 percent ownership interest in most of their business assets. Freedman's own application to the Mississippi Gaming Commission, as well as those of Tollman and Hundley, showed that the market values of Tollman's and Hundley's business interests exceeded, respectively, $34 million and $37 million. Freedman was also directly involved in the hiding by Tollman and Hundley of the HFS

- 63 -

stock accruing to them (worth more than $107 million) by assigning their HFS stock rights to Bryanston; Freedman was executive vice president of Bryanston and signed the assignment agreement on its behalf, and he owned a 4.75 percent interest in Bryanston.

In addition, as described in Part I.A.1. above, Freedman had Tollman-Hundley's outside attorneys create Paternoster and Chelsea, which were funded by Bryanston and hence were owned by Tollman, Hundley, and Freedman, to purchase the victim banks' loans. Freedman had Smith sign Paternoster contracts; and Freedman sent at least one victim bank a letter signed by Tollman and Hundley certifying that they had no beneficial or legal interest, directly or indirectly, in Chelsea.

Thus, while Freedman was not one of the two major beneficiaries of the frauds, he plainly was a key participant, and there can be no doubt that he was aware of the frauds' magnitude. He had participated in the negotiations that led to the restructuring of Tollman-Hundley's debt and hence was aware that Tollman and Hundley were personally liable for about $100 million of that debt. He gave Cohen a list of the creditor banks and the outstanding balances, with instructions to negotiate to purchase those loans for 20 percent or less of their balances.

Further, Freedman was a multi-million-dollar beneficiary of the frauds. Although the district court stated that no part of the banks' $106 million loss was actually paid to Freedman, that was a consequence of the fact that the frauds were designed to result in a reduction of debt rather than an extraction of cash. In fact, however, the assignment by Tollman and Hundley to Bryanston of their HFS stock--which might otherwise have had to be used to pay their

- 64 -

deficiency notes--inured to the benefit of Freedman as a part owner of Bryanston. Given that the proceeds from the HFS stock exceeded $107 million and that Freedman's share of Bryanston was 4.75 percent, the frauds resulted in an increase in the value of Freedman's interest in that company by more than $5 million. Even without regard to that increase in the value of Freedman's interest in Bryanston, the amount that the district court found Freedman had gained and should forfeit as a result of his participation in the bank fraud offenses (to wit, salary, legal fees, and the value of shares he received in the casino venture) exceeded $3 million.

Thus, we conclude that the court's finding that the magnitude of the banks' losses overstated Freedman's culpability and was "wildly" disproportionate to his gain was a clearly erroneous assessment of the evidence in the record as to the nature and pervasiveness of his actions and his substantial financial interest in the success of the frauds. And to the extent that the district court departed downward based on its refusal to consider the entire loss caused by the coconspirators, it erred by ignoring the principle that a coconspirator is to be held accountable for the entire amount of loss that was reasonably foreseeable to him.

We also conclude that in determining the sentence to be imposed on Freedman, the court erred in its interpretation of § 3553(a)'s requirement that the court consider the need for "just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and, as a consequence, in its view as to what constitutes "adequate deterrence to criminal conduct," id. § 3553(a)(2)(B). The court ruled that although the seriousness of Freedman's offense would ordinarily warrant a prison term, Freedman had already received "just

punishment for the offense" because of "the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution." (Freedman S.Tr. 63-64.) The court also found that these factors were sufficient to accomplish "deterrence in the general sense." (Id. at 64.) As a matter of law and reason, we cannot agree.

First, the consequences listed by the court are hardly unusual. An attorney convicted of a felony usually loses his license to practice law. The imposition of a light sentence on this basis is not within the court's discretion. See, e.g., Koon, 518 U.S. at 110 (finding the court's downward departure based on the defendants' being "barred from future work in" their chosen occupations to be an abuse of discretion: "Although cognizant of the deference owed to the District Court, we must conclude it is not unusual for a public official who is convicted of using his governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field." (emphasis added)).

Nor is it unusual for a person convicted of participating in a conspiracy to perpetrate massive frauds to be publicly prosecuted and suffer public humiliation. Those are consequences generally suffered by anyone accused and convicted of a crime, especially a crime involving frauds causing losses of more than $100 million. Thus, the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.

Finally, the circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view--i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough--would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

3. Departure for Freedman's Family Circumstances

As discussed in Part II.B.3. above, departures based on family responsibilities are not permitted by the advisory Guidelines except in extraordinary circumstances. The district court granted such departures in favor of Freedman on the basis of his long relationship with his brother, who is mentally retarded and has cerebral palsy, and, separately, on the basis of his relationship with his mother-in-law, who is elderly. While these circumstances are sympathetic, they fall short, singly and in combination, of showing the extraordinary circumstances needed to relieve Freedman

- 67 -

of a substantial prison term.

Freedman is not his disabled brother's primary care-giver. His brother lives in an assisted living facility. Further, although Freedman's relationship with his brother seems more substantial than some sibling relationships, their relationship does not involve frequent interaction in person. Freedman lives in New York and his brother lives in Massachusetts; their communications are largely telephonic. In addition, although the court found that Freedman provides his brother with a type of support that others cannot provide and have not provided, the court did not mention the fact, noted in the PSR, that Freedman has a sister who lives in Massachusetts and shares the responsibility for making decisions with respect to their brother's affairs. It is beyond the bounds of discretion to conclude that Freedman's brother's need to telephone Freedman, sympathetic as it is, warrants the reduction of Freedman's prison time from the PSR-recommended 108-135 months to zero.

Nor is Freedman the primary care-giver for his mother-in-law. She too lives in an assisted living facility. And the court's only finding in support of its conclusion that this relationship too "entitle[d] Mr. Freedman to a downward departure" was that Freedman "manag[es her] affairs and tak[es] her out." (Freedman S.Tr. 59-60.) These circumstances fall far short of a basis for departure.

4. Departure on Account of Freedman's Age and Health

Finally, we turn to the court's departure on the basis of Freedman's age--nearly 69 at the time of sentencing--and his health. "Age . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."

Guidelines § 5H1.1 (Policy Statement). This departure is most troublesome because of the implications of the court's findings with respect to the ability of the BOP to care for prisoners who have heart conditions and because the evidence as to the ailment on which the court principally relied indicated that that ailment was not caused by Freedman's heart condition and was neither permanent nor constant.

The Sentencing Reform Act provides that the Sentencing Commission "shall consider whether" various factors, including a defendant's physical condition, "have any relevance" to the "imposition of [a] sentence[] of . . . imprisonment," and that it "shall take th[ose factors] into account only to the extent that they do have relevance." 28 U.S.C. § 994(d)(5). The Guidelines state that a defendant's "[p]hysical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," Guidelines § 5H1.4 (Policy Statement). Accordingly, we have stated that in order to warrant a departure resulting in a nonincarceratory sentence on the basis of an extraordinary health condition, the "defendant must be seriously infirm with [a] medical condition that cannot be adequately cared for by [the] Bureau of Prisons . . . ." United States v. Martinez, 207 F.3d 133, 139 (2d Cir. 2000); see generally United States v. Altman, 48 F.3d 96, 104 (2d Cir. 1995).

In connection with Freedman's heart condition, the government submitted the BOP Health Systems Administrator's statement that the inmates housed and cared for by the BOP include "18,877 with hypertension, 4,016 with hyperlipidemia, 1,926 with carotid artery disease, 4,000 with cardiac disease, 3,465 with

arteriosclerotic heart disease, 2,100 with cardiac arrhythmia, and 1,121 with congestive heart failure." (First Cadogan Letter at 2.) The BOP represented that it could provide adequate medical care for Freedman as well. In addition, following Freedman's near-fatal bout with urosepsis, the government presented evidence that the BOP has contracts with major medical centers that offer the BOP "a wide range of trained surgical specialists," and that each prison has procedures in place to provide both "routine" care and timely "emergency transportation" to one of the local medical centers. (Second Cadogan Letter at 1.)

The district court, in concluding that the BOP could not adequately care for Freedman, stated that it knew that each prison had contracts with outside medical facilities, but stated, "I also know it to be true . . . that <u>one does not get the immediate monitoring and immediate response that in this instance has proved so necessary literally for Mr. Freedman's life</u>." (Freedman S.Tr. 58 (emphasis added).) The court found that "the BOP does not have the ability, in my view, to monitor Mr. Freedman's situation <u>constantly</u> and to respond immediately," and that "<u>the recent health issue</u> has made it very, very plain that without that <u>ability to monitor constantly</u> and respond immediately, sending Mr. Freedman to prison would in effect be a death sentence." (<u>Id</u>. (emphases added).)

We have two principal difficulties with the court's findings. Preliminarily, however, we note that the court's statement that "sending Mr. Freedman to prison would in effect be a death sentence" appears, on this record, to be hyperbole. After so stating, the court proceeded to address other bases for departure (<u>e.g.</u>, Freedman's relationships with his brother and mother-in-law)

and concluded that both warranted a downward departure (see id. at 59-60). The court also considered Freedman's charitable works, along with "the collateral consequences suffered here"--apparently referring to Freedman's public humiliation and the loss of his license to practice law--and "the substantially overlapping enhancements"--apparently referring to the magnitude of the losses and the need for more than minimal planning in order to defraud banks of amounts of such magnitude (which were the only recommended enhancements that were accepted by the court)--and concluded that "all of these factors . . . in combination also independently deserve[d] a downward departure." (Id. at 60). Without endorsing the proposition that these factors could justify a downward departure, we presume that there would have been no need to address any other ground for departure if the court had literally meant that a prison term for Freedman would result in his death.

Our main difficulties with the court's decision that Freedman's health precluded imprisonment are (1) that the district court's views constitute a clearly erroneous assessment of the evidence, in light of Freedman's own evidence as to both the onset and the outcome of his near-fatal episode of urosepsis, and (2) that the court cited no evidentiary support for its assertion that the BOP cannot provide adequate care for Freedman.

As to the state of Freedman's health, the court referred to "the recent health issue," to a need for "constant[]" monitoring, and to the availability of an "immediate response that in this instance has proved so necessary literally for Mr. Freedman's life" (id. at 58). The court did not refer, however, to any of the details of Freedman's recent health scare, and those details raise

- 71 -

serious questions as to the court's conclusion that the BOP lacks the ability to care for Freedman, for the evidence did not indicate that he needs to be "monitor[ed] constantly."

First, while Freedman's heart condition made treatment for his emergency problem difficult, the episode that was life-threatening was not caused by his heart condition. Although it was, as his cardiologist stated, "an unfortunate event" that "demonstrate[d] the necessity of careful and ongoing medical care, given [his] cardiac condition," it nonetheless was an "event" (Reison May 23 Letter at 1), rather than either an aspect of his chronic heart condition or an additional permanent condition.

Second, the reports of Freedman's physicians revealed the transitory nature of the event, which began as kidney stones blocking Freedman's urinary tract, causing pain and fever. Freedman's urologist explained that, in the hospital, a catheter was inserted, bypassing an obstructing stone, and that Freedman thereafter went into shock and urosepsis. (See Wechsler May 10 Letter.) Hospital records show that after some 3½ weeks, nearly two of which Freedman spent in intensive care, a procedure was performed in which Freedman's kidney stones were broken up and most of the pieces removed (see Discharge Summary Note for Freedman, Sanford, by Michael Wechsler, M.D., dated April 20, 2005 ("Hospital Discharge Summary Note"), at 2-3); that Freedman "tolerated the procedure well and was sent to the recovery room in good condition" (Operative Report of Michael Wechsler, M.D., dated April 19, 2005 ("Operative Report"), at 2); and that there were no complications (see Hospital Discharge Summary Note at 3).

One day after that procedure, Freedman was well enough to

leave the hospital. Upon his discharge, his condition was "[g]ood, tolerating [a] regular diet," and he was able to "ambulate independently without problems." (Id.) Although after the April 19 procedure a few tiny fragments of stone had remained, the urologist's "feeling was that these fragments would easily pass." (Operative Report at 2.) By the time of the urologist's May 10 letter to the court, only one fragment of stone remained; the letter stated that if that remaining fragment did not pass, it would have to be removed surgically; but there was no suggestion that there was any impediment to that procedure should it be needed. (See Wechsler May 10 Letter.) The need to "watch[ Freedman] closely" was described only as persisting "until he is stone-free and until his condition is completely stabilized." (Id.) The letter stated that Freedman had "continued to do fairly well." (Id.)

As to the period following Freedman's discharge from the hospital, the records of his visits to his cardiologist's office reflected that Freedman "feels well" (Notes of Dr. Reison dated April 28 and May 2, 2005), and that Freedman "feels OK but still fatigues easily" (Notes of Dr. Reison dated May 23, 2005). The cardiologist's May 23 letter to the district court stated that Freedman's "recovery since his hospitalization has been slow but steady. He currently is gaining strength . . . ." (Reison May 23 Letter at 1.)

There is no question that Freedman's episode with urosepsis presented an emergency event that was nearly fatal; but these records show that the event was transitory, an infection from which Freedman recovered.

Third, the onset of Freedman's emergency was not sudden.

Freedman was admitted to the hospital on March 25; however, his painful symptoms had begun days earlier. Freedman's wife, in a letter to the district court, stated that "[d]uring the week of March 20, [Freedman] was experiencing great pain from kidney stones. His symptoms grew worse throughout the week . . . ." (Letter from Frances Freedman to Judge Preska dated June 6, 2005 ("Frances Freedman Letter"), at 1 (emphases added).) By the end of the week his condition had so deteriorated that Freedman's cardiologist, Dr. Reison, was consulted, and he instructed Mrs. Freedman to take Freedman to the hospital emergency room. (See id.) The crucial need for "rapid attention" was attributed by his cardiologist to "his deteriorating status." (Reison May 23 Letter at 1.) However, according to Freedman's wife's letter to the court, it had taken nearly a week after the onset of his pain for Freedman's problem to grow to crisis proportions.

The district court, in "find[ing] that adequate medical care for [Freedman] cannot be accomplished in prison" (Freedman S.Tr. 64), made no reference to any of these facts--the fact that Freedman's urosepsis was not caused by his cardiac condition, the transitory nature of the urosepsis, the length of time it had taken for his condition to reach crisis proportions, and the physicians' reports that Freedman was doing well after leaving the hospital. Thus, in finding that adequate medical care cannot be provided because "the BOP does not have the ability, in my view, to monitor Mr. Freedman's situation constantly and to respond immediately" (id. at 58 (emphasis added)), the court ignored the fact that Freedman did not require "constant[]" monitoring: his condition did not reach emergency proportions until he had been in "great pain" for a

- 74 -

week.

Further, the district court's view that Freedman's condition requires "constant[]" monitoring was clearly erroneous in light of the statements of Freedman's physicians and the medical records. The cardiologist's statement that Freedman would not have survived without "rapid attention to his deteriorating status" (Reison May 23 Letter at 1) was focused on a status that had been preceded by several days of Freedman's own delay in seeking medical attention for his painful symptoms. As to Freedman's status after leaving the hospital, the cardiologist stated that Freedman's cardiac condition requires "careful and ongoing medical care" (id.), and the urologist stated that Freedman "will need to be watched very closely" "until he is stone-free and until his condition is completely stabilized" (Wechsler May 10 Letter (emphases added)); but neither physician stated that Freedman needed to be monitored "constantly."

Indeed, we see no suggestion in the record that, following his release from the hospital, Freedman was so monitored. The record does not indicate that he saw his cardiologist more than once or twice a week; and the hospital's "discharge plans" called for Freedman to "[f]ollow up with [his urologist] in 2 weeks" (Hospital Discharge Summary Note at 3 (emphasis added)).

Thus, the major premise of the district court's finding that the BOP cannot adequately care for Freedman, i.e., that he requires "constant[]" monitoring, reflects a clearly erroneous assessment of the evidence. As there was no evidence that Freedman's heart condition requires constant monitoring, the court's view that the BOP cannot provide constant monitoring for his heart

condition provides no basis for giving Freedman a nonincarceratory sentence.

Finally, even if the record supported the court's premise that Freedman's condition required constant monitoring, we see no support in the record for the district court's finding that the BOP could not or would not provide that care. The government presented evidence that the BOP cares for many thousands of inmates who have, inter alia, cardiac disease, hypertension, carotid artery disease, arteriosclerotic heart disease, cardiac arrhythmia, and/or congestive heart failure. Although the court stated that it "know[s] it to be true . . . that one does not get . . . immediate monitoring and immediate response" from the BOP, the court cited no evidence to support that statement. If there is evidence to support a finding that the BOP is incapable of providing prompt response to inmates' emergency medical needs, its disclosure is not only essential to the sustainability of the findings in this case, it is essential for the avoidance of unwarranted disparities among similarly situated defendants; and it is in the best interest of a humane society that any such evidence be disclosed.

In sum, in all the circumstances indicated here, the district court's reasons for imposing on Freedman a nonincarceratory sentence are not supported by the evidence. The record does not support the proposition that Freedman's medical condition cannot be adequately cared for by the BOP, and we thus cannot conclude that the departure on the basis of his health--either alone or in combination with any other factors--was authorized.

CONCLUSION

We have considered and found to be without merit the arguments of Cutler and Freedman in opposition to the government's appeal and cross-appeal, respectively, challenging the sentences imposed on them. Given the procedural errors, the clear factual errors, and the misinterpretations of the § 3553(a) factors discussed above--in particular of the needs to provide just punishment, to afford adequate deterrence of crimes by others, to avoid unwarranted disparities among similarly situated defendants, and to promote respect for the law--we conclude that the court's sentence on Cutler insofar as it ordered him to serve a relatively short term of imprisonment, and its sentence on Freedman insofar as it imposed no term of imprisonment, are substantively unreasonable and constituted an abuse of discretion. Accordingly, the sentences imposed on Cutler and Freedman are vacated, and the matters are remanded for further proceedings not inconsistent with this opinion.

POOLER, Circuit Judge, concurring:

I agree with the majority that the two sentences about which we write today must be vacated and the cases remanded to the district court. My disagreement is, in part, with the breadth of the discussion. The majority opinion skillfully explains the several procedural errors committed by the district court in imposing sentence. I need not repeat them here. Whether or not I agree with each finding of error, I concur that remand for resentencing is required. Since we find that the district court has not, as yet, imposed a procedurally adequate sentence, my understanding of United States v. Booker, 543 U.S. 220 (2005), and the triad of recent cases, Rita v. United States, 127 S. Ct. 2456 (2007), Kimbrough v. United States, 128 S. Ct. 558 (2007), and Gall v. United States, 128 S. Ct. 586 (2007), is that it is premature for the appellate court to engage in substantive review. I believe that the district court is entitled to the opportunity to correct procedural errors and, if or when a procedurally correct sentence is imposed, and is appealed, we may engage in substantive reasonableness review -- applying "a deferential abuse-of-discretion standard," Gall, 128 S. Ct. at 591, id. at 598, and, when a sentence is outside the Guidelines range, giving "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance," Gall, 128 S. Ct. at 597. By concluding that the sentences of Cutler and Freedman are substantively unreasonable, the majority is substituting its view of what their proper sentences are, for that of the district court, an exercise we are reminded is not within our province to accomplish.